26-1136

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ERIC COOMER, PH.D.,

*Plaintiff-Appellee,*

-against-

MICHAEL J. LINDELL; FRANKSPEECH LLC,

*Defendants-Appellees,*

MY PILLOW, INC.,

*Defendant.*

CHRISTOPHER J. KACHOUROFF; JENNIFER T. DEMASTER; MCSWEENEY, CYNKAR & KACHOUROFF, PLLC,

*Appellants.*

*On Appeal from Order and Judgment of the U.S.*
*District Court for the District of Colorado-Denver, 1:22-cv-01129*
*Rendered by Hon. Nina Wang, U.S.D.J.*

**APPELLANTS' OPENING BRIEF**

| | |
|---|---|
| **DOMINION LAW CENTER, P.C.** | **BERENS & MILLER, P.A.** |
| 13649 Office Place, Suite 101 | 80 South 8th Street, Suite 3720 |
| Woodbridge, VA  22192 | Minneapolis, MN  55402 |
| (703) 365-9900 | (612) 688-6516 |
| Christopher Ivan Kachouroff, Esq. | Barbara Berens, Esq. |

*Attorneys for Plaintiffs-Appellants*

**ORAL ARGUMENT REQUESTED PURSUANT TO R.  28.2(C)(4)**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Michael J. Lindell is an individual.  Appellant Frankspeech LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## PRIOR APPEALS

There are no prior or related appeals.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................2

PRIOR APPEALS ........................................................................................2

TABLE OF AUTHORITIES ..............................................................................5

JURISDICTIONAL STATEMENT ......................................................................6

STATEMENT OF THE ISSUES ........................................................................7

STATEMENT OF THE CASE ..........................................................................9

SUMMARY OF THE ARGUMENT ...................................................................17

ARGUMENT ............................................................................................20

    I.    FRANKSPEECH HAS IMMUNITY UNDER 47 U.S.C. § 230(c)(1). 20

        *A. Frankspeech Has Immunity Pursuant to 47 U.S.C. § 230 Because It Did Not Develop, Create, or Encourage the Challenged Content.* ....20

        *B. The District Court's Reliance on Colorado Agency Law Fails as a Matter of Law and Fact.*................................................................22

        *C. The District Court's Reliance on Agency or Alter Ego Theories Fail Even if Colorado Law Were to Apply.* ...............................................25

    II.    THE DISTRICT COURT'S RULING ON ACTUAL MALICE AS TO BOTH APPELLANTS IS FATALLY FLAWED.........................................29

        *A. Lindell's Purported Hostility Fails to Support a Finding of Actual Malice.*...................................................................................30

        *B. The Inherent Improbability of Lindell's Challenged Statements Does Not Support a Finding of Actual Malice in the Absence of Any Evidence that Lindell Seriously Doubted the Truth of Those Statements.*............................................................................31

        *C. The Jury's Finding that Lindell Was not Liable for Punitive Damages Further Supports the Absence of Actual Malice.*.................32

        *D. The District Court's Ruling that Frankspeech Acted with Actual Malice also Fails as a Matter of Law.* ...............................................33

    III.    THE DAMAGE AWARDS SHOULD NOT STAND. ......................34

        *A. The Damages Award is Fatally Flawed for a Number of Reasons.* ...............................................................................................34

        *B. The Testimony of Coomer's Damages Expert Fails to Support a Viable Damages Award.*..................................................................37

*C. The Punitive Damages Award Against Frankspeech Should Be Reversed.* ........................................................................40

IV.     THE JURY'S VERDICT FINDING FRANKSPEECH LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS TO MEET THE REQUISITE LEVEL OF EXTREME AND OUTRAGEOUS CONDUCT. ..................................................................................40

CONCLUSION ..............................................................................................42

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT .............................42

LIST OF ATTACHED ORDERS AND RELEVANT TRANSCRIPT .................43

CERTIFICATE OF COMPLIANCE ...............................................................44

10th Cir. R. 31.3(B) CERTIFICATE OF SEPARATE BRIEFS ..........................44

CERTIFICATE OF DIGITAL SUBMISSION ..................................................44

CERTIFICATE OF SERVICE ........................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). .............................29

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980 (10th Cir. 2000)....21, 23

*Dallas Creek Water Co. v. Huey*, 933 P.2d 27 (Colo. 1997)........................... 22, 25

*Daniel v. Armslist*, 926 N.W.2d 710, 726 (Wis. 2019)...............................................25

*Fresquez v. Trinidad Inn, Inc.*, 521 P.3d 399, 406 (Colo. App. 2022 .....................25

*FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) ...................... 21, 24

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 687-68 (1989) ................................................................................................ 30, 31

*In re Phillips*, 139 P.3d 639, 644 (Colo. 2006).......................................................28

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 413-14 (6th Cir. 2014)............................................................................................................24

*Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004) ..........27

*Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003) (citation omitted) ...............28

*Lewis v. McGraw-Hill Broadcasting Company, Inc.*, 832 P.2d 1118, 1123 (1992) ....................................................................................................................32

*Masson v. N.Y. Mag., Inc.*, 501 U.S. 496, 510 (1991) ...............................................17

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) .......................................29

*Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264 (1974) ..............................18

*Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) ......................................29

*State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 656 (Colo. 2017).........26

*Talley v. Time, Inc.*, 923 F.3d 878 (10th Cir. 2019) ......................................... 30, 32

**STATUTES**

§ 230(f)(2). ................................................................................................................20

47 U.S.C. § 230(c)(1)......................................................................... 7, 20, 29

**TREATISES**

Robert D. Sack, *Sack on Defamation*, §§ 10.5.3, 10.5.5.2 (3d ed. 2007)................37

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332 over the underlying action. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. On March 25, 2026, the district court denied Appellants Frankspeech LLC and Micheal J. Lindell's renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). 17. A.5066. Appellants timely filed their notice of appeal, and thus this appeal is properly before the Court.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in ruling that Frankspeech LLC is not entitled to immunity under 47 U.S.C. § 230(c)(1) where it is an interactive computer service that merely hosted and livestreamed content originated by others, and the district court improperly relied on state law agency and alter ego theories to reject the application of the statute and impose liability in contravention to the statute's text, definitions, and preemption provision.

2.      Whether the district court erred in finding actual malice as to Michael J. Lindell ("Lindell") where the undisputed record demonstrates that Lindell spent $50 million of his own funds and retained independent experts which informed and supported his subjective belief in the truth of the two challenged statements the jury found actionable and the district court improperly ignored that undisputed record and incorrectly substituted its own judgment that the challenged statements were "inherently improbable" as a matter of law and also improperly relied on Lindell's alleged hostility toward Plaintiff in support of its ruling that Lindell acted with actual malice.

3.      Whether the district court erred in finding that Frankspeech acted with actual malice where its ruling on actual malice as to Lindell was fatally flawed and there is no evidence to conclude that Frankspeech acted with actual malice for

purposes of the challenged statement made by another individual unrelated to either Frankspeech or Lindell.

4.      Whether the evidence was sufficient to support the jury's award of damages as to Lindell and Frankspeech where Coomer testified that his reputation had already been destroyed by earlier statements made by a non-party, Joseph Oltmann, as well as the alleged republication of Oltmann's statements by twenty-five other people Coomer sued, there was no evidence introduced or mechanism proposed to separate the alleged harm that Coomer suffered at the hands of others, and Coomer's damages expert never addressed the undisputed, prior destruction of Coomer's reputation because the expert was expressly instructed not to do so, where the district court never gave any consideration of the legal impact of Coomer's admission of the prior destruction of his reputation, including by failing to give any jury instructions or other means for the jury to consider the evidence of the unrelated destruction of Coomer's reputation, where Coomer proffered no evidence to support the existence of any incremental economic damage caused by Appellants' challenged statements, where Coomer admitted he never took any steps to repair his reputation (and thus, mitigate his purported damages), and the "reputational repair" measure used by Coomer's expert was an improper and speculative basis to support the award of economic damages, particularly given the expert's failure to even

address, much less try to quantify, the undisputed reputational harm caused by Oltmann and others.

5.    Whether the jury's award of punitive damages against Frankspeech should be reversed where the jury did not award any punitive damages against Lindell and there was no evidence introduced to support an award of punitive damages based on the conduct of the only other individual whose actions could support such an award.

6.    Whether the jury's findings that Frankspeech was liable for intentional infliction of emotional distress should be reversed where the jury found Lindell was not liable for intentional infliction of emotional distress and there was no evidence introduced to support a claim for intentional infliction of emotional distress based on the conduct of the only other individual whose actions could support such a claim.

## STATEMENT OF THE CASE

This defamation action arose in the highly charged political atmosphere surrounding the 2020 presidential election. Plaintiff Eric Coomer, Ph.D. ("Coomer" or "Plaintiff"), a former executive of Dominion Voting Systems ("Dominion"), alleged, inter alia, that Defendants My Pillow Inc. ("My Pillow"), Lindell, and Frankspeech (collectively "Defendants") defamed him by republishing statements that the undisputed evidence showed were originally made by non-party Joseph Oltmann ("Oltmann").

Oltmann, who hosts a daily podcast, testified that in mid-to-late September of 2020, he gained access to an Antifa conference call, involving discussions regarding the upcoming presidential election. 13 A.3636 (Trial Tr. at 515). Oltmann claimed there was an individual named "Eric," on the call who was referred to as "the Dominion guy." *Id*. Oltmann said "Eric" told the group that they need not worry about the upcoming election because Donald Trump ("Trump") was not going to win, and that "Eric" had "made f-ing sure of it." 13 A.3636-37 (Trial Tr. at 515-16).

Oltmann testified that during his podcast on November 9, 2020, just six days after the election, he first reported on Eric's statements, 13 A.3641-42 (*id*. at 520-21), and Oltmann continued to repeat them during subsequent podcast episodes as well as during media interviews and public events. 13 A.3641-43 (*Id*. at 520-22). Oltmann acknowledged he had repeated the claims during a May 3, 2021 interview that later aired on Frankspeech and again when he spoke at an August 2021 Cyber Symposium ("Symposium") in South Dakota sponsored by Lindell. 13 A.3642-43 (*Id*. at 521-22); 13 A.3772-73 (Trial Tr. at 651-52); 16 A.4635 (*Id*. at 984). Oltmann was clear he had accurately attributed and repeated the statements made by "Eric" during the Antifa conference call and that Oltmann acted responsibly by bringing the information to the public's attention. 13 A.3636-37 (Trial Tr. at 515-16); 13A.3863-73 (*Id.* at 742-52).

David Clements ("Clements") also made statements about Coomer at the Symposium. 10 A.2939 (Jury Instruction No. 8, Stipulated Facts ¶ 36). Lindell testified that he had never met Clements or Oltmann before the Symposium. 16 A.4633-34 (Trial Tr. at 982-83). Oltmann testified that Lindell did not direct him or Clements to make specific statements about Coomer on stage at the event. 13 A.3774 (Trial Tr. at 653).

Lindell is the CEO of My Pillow and the founder of Frankspeech, an online video platform. 15 A.4494 (Trial Tr. at 843). Lindell testified in late 2020 or early 2021, Oltmann first informed Lindell about Coomer's alleged statement that he "made f-ing sure" that Trump would not be elected. 17 A.4967-68 (Trial Tr. at 1314-15). Lindell testified that he genuinely believed and repeated Oltmann's statements about Coomer, viewing them as credible evidence that Dominion Voting Systems' voting machines had been used to rig the 2020 presidential election. 17 A.4967-69 (*Id*. at 1314-16). Lindell further testified that he spent tens of millions of dollars and relied on independent experts to investigate the integrity of voting machines as well as the 2020 election. *See, e.g.*, 15 A.4507 (*Id*. at 856).

Lindell testified that he first became seriously concerned about potential vulnerabilities of voting machines after viewing the documentary Kill Chain in December 2020, which caused him to investigate further. 14 A.4057-60 (Trial Tr. at 1443-46). He explained that his belief about serious election integrity issues was

reinforced when Dominion and other voting machine companies responded to questions by filing lawsuits against poll watchers and other individuals rather than providing transparent access to their machines, which Lindell interpreted as an effort to suppress questions rather than disproving the concerns.  14 A.4060-61, 14A.4065-66 (*Id*. at 1446-47, 1451-52).

Lindell further testified that he relied on information from multiple sources, including Oltmann, and that he believed the claims about Coomer's participation in an Antifa conference call because the information came from individuals he viewed as credible after he conducted extensive due diligence.  14 A.4068-69 (*Id*. at 1454-55).  Lindell had no reason to doubt the accuracy of the information he was disseminating when he made the challenged statements and years later, he still believes the core claims based on the evidence available to him.  14 A.4069-70 (*Id*. at 1455-56).

Coomer brought this lawsuit on April 4, 2022, and in his First Amended Complaint, asserted claims for defamation, intentional infliction of emotional distress ("IIED"), and civil conspiracy against Lindell, Frankspeech, and My Pillow Inc.  1 A.112 (First Am. Compl. ¶¶ 117-30).

Defendants moved to dismiss, and in March 2023, the district court denied the motion.  1 A.277-300; 2 A.301-03 (3/15/23 Order Denying Defs.' Mot. to Dismiss) ("2023 Order").  The district court held, inter alia, that the challenged statements

related to a matter of public concern (election security), that Coomer plausibly alleged actual malice based on Defendants' reliance on Oltmann despite "obvious reasons to doubt" his veracity, and that Lindell's statements were actionable statements of fact rather than protected opinion. 1 A.282-87 (2023 Order at 6-11).

In June 2025, a ten-day jury trial was held. The jury found Lindell liable for defamation on only two statements (on May 9, 2021, and April 6, 2022) of ten challenged statements that were sent to the jury. 10 A.3033 (Lindell Verdict Form). The jury found that Lindell was not liable for intentional infliction of emotional distress ("IIED") or civil conspiracy, awarding Coomer $144,000 in noneconomic damages and $246,500 in economic damages, but no punitive damages. 10 A.3005 (Lindell Verdict Form).

The jury found Frankspeech liable for defamation on three statements, the same two as Lindell, plus a statement made by another individual, David Clements, at the Cyber Symposium. 10 A.3007-08 (Frankspeech Verdict Form). The jury found it liable for IIED, but not civil conspiracy. 10 A.3008-09 (*Id.*). It awarded Coomer $432,000 in noneconomic damages, $1,133,500 in economic damages, and $300,000 in punitive damages as to Frankspeech. 10 A.3009 (*Id.*). The jury found that My Pillow was not liable on all claims. The specific statements on which the jury found liability are set out here.

During a May 9, 2021 interview that aired on Frankspeech, Lindell stated:

It's over for Dominion, it's too late to close the gate. The cows are out of the barn. Dominion, you did your best, and Smartmatic, to take our country through China. You did your best, you corrupt people, you. You tried to suppress our voice. You did it, but you failed. And I'm telling you, you Coomers of the world. What's his name? Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America.

10 A.2941-42 (Final Jury Instructions No. 8, Stipulated Facts ¶ 28). During an April 6, 2022 interview that aired on Frankspeech, Lindell stated:

Eric Coomer, you are a criminal. Eric Coomer, your lawyers better look out. I'm not putting up with this. My Pillow doesn't even know who you are. My employees, I have 2,700 employees. Shame on you Eric Coomer. You did a very, very stupid move, Mr. Coomer. You're going to be the first one, right behind Raffensperger and Jena Griswold behind bars. You're #1 on my list. You go after my employees, go after my company again, you're disgusting. You've been a part of the biggest crime this world has ever seen. Eric Coomer, president of Dominion, you have even said what you did or what you were going to do. You're disgusting. You're disgusting, you're evil, you belong behind bars, and we will not stop until you are behind bars. We're going to melt down your little machines and you're going to hang on to your little prison bars. 'Let me out, let me out!' Should have thought about that, Eric Coomer, before you did crimes against the United States and quite frankly all of humanity. It's disgusting what you've done. You and Dominion. And Jena Griswold.

10 A.2944-45 (Final Jury Instruction No. 8, Stipulated Facts ¶ 40). During the August 12, 2021 Symposium, which was livestreamed on Frankspeech, David Clements, a third party who attended the Symposium, stated that:

Alright, so you've got a couple of hitmen that were pulling the triggers. The first gentleman, if you know, is John Poulos, who is the CEO of Dominion. When he gave those remarks, it was before the legislature, under oath. John Poulos committed perjury, time and time again. The other gentleman at the end was a person we've heard about because of Joe Oltmann. Eric Coomer, who holds the patent for the feature known as adjudication, which is one of the tools in their tool chest to murder the American people's vote. And this is one of the statements he made along with, when Joe Oltmann talked about being on the call, this is what he heard. And you heard from Joe Oltmann. You can assess whether you think he's telling the truth. 'I made f-ing sure that Trump's not going to win.' That's the vice president of a company that's running elections in 28 states. You've got your election cartel, you've got your vote trafficking organizations, and you have the man that pulled the trigger.

10 A.2944 (Jury Instruction No. 8, Stipulated Facts ¶ 36).

The jury's award of $2.3 million in damages is itemized as follows:

|  | Noneconomic | Economic | Punitive |
|---|---|---|---|
| **Lindell** | $144,000.00 | $296,500.00 | $0.00 |
| **Frankspeech** | $432,000.00 | $1,133,500.00 | $300,000.00 |
| **MyPillow** | $0.00 | $0.00 | $0.00 |
|  | $576,000.00 | $1,430,000.00 | $300,000.00 |

10 A.3003-06 (Lindell Verdict Form); 10 A.3007-09, 11 A.3010 (Frankspeech Verdict Form); 18 A.5265-68 (My Pillow Verdict Form).

Appellants subsequently renewed their motion for judgment as a matter of law, 15 A.4365-68 (Trial Tr. at 1751-54), which the district court denied. 17 A.5011-39 ("Posttrial Order"). In its Posttrial Order, the district court noted that the

Defendants argued Coomer's reputation had already been "destroyed" by statements made by other parties, including Oltmann, before Lindell or Frankspeech made any of the statements the jury found defamatory. 17 A.5024 (*Id*. at 14). Yet as set forth *infra*, the jury was never instructed about their consideration of the possible legal impact of that undisputed, unrelated destruction of Plaintiff's reputation by other, unrelated third parties. 17 A.5024 (*Id*. at 14); 10. A.2930-3002 (Final Jury Instructions).

The court also disregarded Frankspeech's argument that it was immune under 47 U.S.C. § 230, concluding without the benefit of any supporting evidence that there was no immunity as a matter of law because Lindell acted as Frankspeech's "alter ego" or "agent" and Clements was Frankspeech's agent at the Cyber Symposium (the "sponsored, promoted, and broadcasted" theory). 17 A.5017-23 (Posttrial Order at 7-13).

The court upheld the jury's award of damages based on evidence of "continued harassment" linked to the timing of the Symposium and Coomer's expert Doug Bania's $2.7 million estimate of the cost of a "reputational repair program." 17 A.5024-25 (*Id*. at 14-15).

The court also rejected Appellants' challenge to actual malice, holding that the jury's rejection of punitive damages against Lindell did not preclude the finding of actual malice because the standards are different. 17 A.5026-27 (*Id*. at 16-17).

Coomer also moved to increase the amount of the punitive damages award against Frankspeech, which the court denied.  17 A.5029-35 (*Id.* at 19-25).  This appeal followed.

## SUMMARY OF THE ARGUMENT

The judgment must be reversed for several reasons.  First, Frankspeech is immune from liability under 47 U.S.C. § 230(c)(1) as a matter of law. Frankspeech is an interactive computer service, like YouTube or Rumble, that merely hosts and livestreams content that was originated by others, Lindell in his personal capacity and Clements in his own capacity at the Symposium.  The district court's holding that Frankspeech could be liable under agency principles because it "sponsored, promoted, and broadcasted" the Symposium or because Lindell was Frankspeech's "alter ego" or "agent" or Clement its agent directly conflicts with the plain text of § 230(c)(1), the statutory definitions in §§ 230(f)(2) and (f)(3), the preemption provision in § 230(e)(3), and the congressional policy expressed in § 230(b).

Second, the evidence was legally insufficient to prove actual malice by clear and convincing evidence as to either Appellant.  Actual malice requires proof that the defendant "in fact entertained serious doubts as to the truth of his publication." *Masson v. N.Y. Mag., Inc.*, 501 U.S. 496, 510 (1991).  The jury's explicit rejection of any punitive damages award against Lindell by finding that he did not act with willful and wanton reckless disregard, which requires proof beyond a reasonable

doubt, eviscerates any finding of actual malice where the inquiry as to both is based on the same set of facts.

The district court's reliance on evidence of Lindell's alleged "hostility" toward Coomer also fails to support the district court's finding of actual malice under the applicable legal standard. Actual malice, as established in *New York Times Co. v. Sullivan*, requires proof that the defendant made the defamatory statement with knowledge of its falsity or with reckless disregard for its truth or falsity. *New York Times Co.*, 376 U.S. 254, 279-80 (1964). This standard is distinct from common-law malice, the latter of which addresses ill will, spite, or hostility toward the plaintiff. Indeed, courts have consistently held that evidence of hostility, bias, or ill will is insufficient to establish actual malice from a constitutional perspective. *See, e.g.*, *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 280 (1974)(ruling that "[i]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard")(internal quotations omitted). Lindell's alleged hostility therefore fails to support the district court's ruling.

The district court's ruling that Frankspeech acted with actual malice also fails to the extent it was based on the district court's flawed ruling that Lindell acted with actual malice. That ruling is also in error because there is no legitimate basis to conclude that Clement's statements were made with actual malice and Coomer

presented no evidence to demonstrate the Frankspeech acted with reckless disregard of the truth of the three statements at issue here.

Third, the damages award is legally insufficient and rests on an improper and speculative measure. Here, Coomer himself testified that his reputation was already "destroyed" and "shattered" by statements from other parties (primarily Oltmann) before any of the challenged statements at issue here had been made, 12 A.3415-19 (Trial Tr. at 294-98), that he has sued twenty-five other people for republishing Oltmann's purportedly defamatory statements *before* the statements at issue here were made. 12 A.3415 (*Id.* at 294). Despite the evidence of other individuals' alleged defamation and damages, Coomer never produced any evidence isolating the substantial harm he conceded had been caused by others versus the harm allegedly caused by Lindell or Frankspeech. Thus, the amount of damages awarded is speculative at best.

The estimate proffered by Coomer's damages expert, Doug Bania ("Bania"), is also fatally flawed. Bania estimated that the cost to "repair" Coomer's reputation was $2.7 million, based on the hypothetical future costs to conduct public relations campaigns, search remediation, and public perception management, and not actual past pecuniary loss, such as lost wages or lost business opportunities. 14 A.4015 (Trial Tr. at 1401). But Bania had been instructed not to consider the preexisting harm caused by Oltmann and twenty-five other individuals which Coomer admitted

had "destroyed" his reputation. 14 A.4015 (*Id.*). Thus, Bania's damages estimate is speculative and should be ignored.

## ARGUMENT

### I. FRANKSPEECH HAS IMMUNITY UNDER 47 U.S.C. § 230(c)(1).

#### A. *Frankspeech Has Immunity Pursuant to 47 U.S.C. § 230 Because It Did Not Develop, Create, or Encourage the Challenged Content.*

Section 230 of the Communications Decency Act, 47 U.S.C. § 230, was enacted by Congress in 1996 to promote the continued development of the Internet and other interactive computer services. The immunity provision of the statute states that: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). The statute defines "interactive computer service" broadly to include:

> [A]ny information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet.

*Id.* § 230(f)(2). It defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

This Court has interpreted § 230 to provide broad immunity, holding that a provider is deemed to be responsible for purposes of this statute only if it

"specifically encourages development of what is offensive about the content." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009).  The Court further held that "a service provider is 'responsible' for the development of offensive content *only if it in some way specifically encourages development of what is offensive about the content.*"  *Id*. at 1199 (emphasis added).  "To be 'responsible' for the development of offensive content, *one must be more than a neutral conduit for that content.*"  *Id.* (emphasis added).

In *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980 (10th Cir. 2000), this Court held that § 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party."  *Id*. at 984-85.  The Court affirmed immunity existed even in cases where the service exercised some editorial control over the published content.  *Id*. at 985-86.

Here, Lindell provided undisputed testimony that Frankspeech is "a publishing thing like YouTube, people can put stuff up there.  It doesn't do any content itself."  17 A.4855 (Trial Tr. at 1203).  Coomer never provided any other evidence to the contrary.  Because Frankspeech is an interactive computer service that merely hosts and livestreams content that is originated by others, it did not create or develop the challenged content within the meaning of the statute.  As a result, Frankspeech is entitled to immunity under Section 230.

Second, the court held that Clements's statement at the Symposium could be attributed to Frankspeech because it "sponsored, promoted, and broadcasted" the event, and a reasonable jury could conclude that Clements was an agent of Frankspeech for purposes of the Symposium. 17 A.5021-23 (*Id*. at 11-13). If that were the legal standard, then no online provider would ever be entitled to this statutory immunity, which eviscerates the public policy underlying the Communications Decency Act.

The district court's rulings are contrary to law and fact and should therefore but reversed.

### B.  The District Court's Reliance on Colorado Agency Law Fails as a Matter of Law and Fact.

The district court specifically relied on Colorado state law on agency to support its conclusion that Lindell is an agent of Frankspeech and that as a result, Frankspeech was liable for the two allegedly defamatory statements made by Lindell. 17 A.5020 (Posttrial Order at 10)(citing *Dallas Creek Water Co. v. Huey*, 933 P.2d 27 (Colo. 1997)), as setting forth Colorado state law on agency). The district court's reliance on that state agency law is fatally flawed from both a legal and factual perspective.

Section 230(e)(3) expressly provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id*. State agency law and alter ego doctrine impose

liability based on solely on legal relationships and corporate structure, and not whether the content provider was "responsible, in whole or in part, for the creation and development of information." *Ben Ezra, Weinstein, & Co.*, 206 F.3d at 985-86 (affirming grant of summary judgment in favor of defendant even though defendant corrected errors in content published by it).

In *Ben Ezra, Weinstein, & Co.*, this Court affirmed that the defendant was entitled to immunity under Section 230 because, inter alia, the plaintiff had presented no evidence to contradict the defendant's evidence that others, not defendant, had created the content defendant had republished. *Id.* at 986.

That is the situation here. The district court ignored undisputed evidence that the challenged content republished by Frankspeech was created by others and that Frankspeech never created its own content. For example, Lindell specifically testified that he did not control the content posted on Frankspeech (other than his own statements, made on his own *personal* behalf, and not on behalf of Frankspeech) and that he never even knew either Oltmann or Clements before the Symposium. 16 A.4633-34, 17 A.4855, 14 A.4048-49 (Trial. Tr. at 982-83, 1203, 1434-35). Oltmann further confirmed Lindell's testimony that Lindell was not running the speakers at the Symposium or creating the contents of others' speeches or interviews during the Symposium:

> Q: But he [Lindell] didn't tell you to go on stage on August 12th and say anything about Dr. Coomer.

A. No. No, not at all.

Q. And you know David Clements; right?

A. Yes.

Q. And he never told David Clements to go on stage and interview you and say things about Dr. Coomer.

13 A.3774 (Trial Tr. at 653).

Furthermore, Lindell's and Oltmann's testimony about Frankspeech is uncontroverted and there is no other evidence in the record to show that Frankspeech was actively involved developing the challenged content. Thus, Frankspeech is entitled to immunity under Section 230. *See, e.g.*, *FTC*, 570 F.3d at 1198 (requiring service provider's actual, active participation in the development of the challenged content in order to reject statutory immunity).

Allowing state agency principles to override Section 230 immunity without any consideration of whether Frankspeech was actually responsible for or materially contributed to the challenged content would render the preemption provision a nullity. The Court should therefore reject the district court's reliance on Colorado agency law to rule that Frankspeech does not have immunity under § 230. *See, e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 413-15 (6th Cir. 2014)(rejecting argument that a service provider who encourages or ratifies content thus becomes a creator or developer of that content for purposes of the statute and

further ruling that immunity applies unless the provider materially contributes to the content's alleged unlawfulness); *cf. Daniel v. Armslist*, 926 N.W.2d 710, 719-26 (Wis. 2019)(ruling that § 230 immunity applies unless the provider is directly responsible for the creation or development of the content, regardless of any indirect involvement or facilitation). The Court should thus reject the district court's improper reliance on Colorado agency law.

### C. The District Court's Reliance on Agency or Alter Ego Theories Fail Even if Colorado Law Were to Apply.

Even if Colorado agency principles were applicable, the evidence does not support the conclusion that Lindell or Clements acted as an agent of Frankspeech when making the challenged defamatory comments. Colorado agency law requires that an agent's acts bind the principal only if those acts were made within the scope of the agent's authority. *Dallas Creek Water Co.*, 933 P.2d at 41. Actual authority exists only when the agent reasonably believes, based on the principal's manifestations, that the specific act is authorized. *Fresquez v. Trinidad Inn*, 521 P.3d 399, 404-05 (Colo. App. 2022). Here, the evidence is clear that both Lindell and Clements were acting independently from Frankspeech when they had made their challenged statements. Their admittedly independent actions thus demonstrates that there is no support for the district court's ruling that both were agents of Frankspeech as a matter of law.

Nor is the any support for a theory that either Lindell or Clements acted with apparent authority on behalf of Frankspeech. Apparent authority requires that the principal's own conduct creates in a third party a reasonable belief that the agent is authorized to take the particular action at issue. *State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 656 (Colo. 2017). Here, there is no evidence to support a reasonable belief that Frankspeech authorized any speaker to make any statement. First, it is undisputed that Coomer understood that Oltmann was the original source of the challenged statements. 11 A.3219-20 (Trial Tr. at 98-99). Second, the evidence is clear that Lindell never had a prior relationship with either Clements or Oltmann. 16 A.4633-34 (*Id*. at 982-83). Third, Coomer never offered any evidence that either Oltmann or Clements ever had any prior relationship with Frankspeech.

Furthermore, when describing what happened at the Symposium, Coomer's attorney admitted in his opening statement that Frankspeech and Lindell did not play any role in the comments made by Clements or Oltmann at the Symposium:

> And what ended up happening is that numerous space fillers; people that were put on the stage, including Tina Peters, Joe Oltmann, and a gentleman named David Clements, got on stage to talk about whatever they wanted to.

11 A.3151 (Trial Tr. at 30)(emphasis added). That admission thus confirms that Frankspeech did not influence the content of Oltman's or Clements' comments, thus eviscerating the district court judge's conclusion that Clement was acting as Frankspeech's agent.

Furthermore, Frankspeech's mere sponsorship or livestreaming of an event, without more, did not manifest its authority over the personal remarks made by every speaker at the Symposium and it did not transform Lindell's or Clements's individual expressions into speech attributable to Frankspeech. Because the record contains no evidence that Frankspeech authorized or manifested assent to the specific challenged content, and because both speakers were acting in their personal capacities, Colorado agency principles provide no basis for holding Frankspeech liable as principal for this content.

The district court's reliance on an alter-ego theory also fails under Colorado law. An alter-ego finding requires proof that the corporation was a "mere instrumentality" of the shareholder (or other individual) with such unity of interest that separate personalities no longer exist. *See, e.g.*, *Krystkowiak v. W.O. Brisben Co.*, 90 P.3d 859, 867 n.7 (Colo. 2004)(quotation omitted). In determining whether such unity of interest exists, courts are to consider a variety of factors, including whether: (1) the corporation is operated as a separate entity; (2) funds and assets are commingled; (3) adequate corporate records are maintained; (4) the nature of the corporation's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a mere shell; (7) shareholders disregard legal formalities; and (8) corporate funds or assets are used for noncorporate purposes. *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003)

(citation omitted)  Here, the district court failed to consider any of the foregoing factors when setting forth its offhand conclusion that Frankspeech was Lindell's alter ego.  *See generally* 17 App. 5011-39 (Posttrial Order).

Furthermore, there was no evidence adduced that would support the existence of those factors.  There was no evidence that Lindell had commingled personal and corporate funds, failed to maintain corporate records, undercapitalized the entity, or used it as a mere shell for personal purposes.  To the contrary, the testimony establishes that Frankspeech operated as a functioning online video platform with its own website, livestreaming capabilities, and content from multiple sources and speakers in addition to Lindell's personal content. 14 A.4048-49 (Trial Tr. at 1434-35). The district court's finding that Lindell was Frankspeech's "alter ego" for purposes of attributing his personal statements to Frankspeech is therefore unsupported by the record and contrary to applicable law.  *See, e.g.*, *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006)(under Colorado law, veil piercing is an extraordinary, equitable remedy that is not justified based on ownership or operational control alone).

Based on the foregoing, both the law and the evidence demonstrate that Frankspeech was a neutral platform that merely hosted and livestreamed content originated by others. As a result, Frankspeech is immune under § 230(c)(1) and the

district court should have granted judgment as a matter of law on all claims against Frankspeech.

## II.   THE DISTRICT COURT'S RULING ON ACTUAL MALICE AS TO BOTH APPELLANTS IS FATALLY FLAWED.

To prevail on a defamation claim involving a matter of public concern, a plaintiff must prove by clear and convincing evidence that the defendant acted with "actual malice," which requires that the defendant either knew that the challenged statement was false or acted with reckless disregard as to its truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. 279-80.   This Court has ruled that reckless disregard requires "sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication*." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) (emphasis added).   Furthermore, a plaintiff must show this by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).

Here, the district court improperly concluded that Frankspeech and Lindell acted with actual malice.   In so ruling, the district court relied on two impermissible items to support that conclusion:   Lindell was allegedly "hostile" toward Coomer and the Lindell's challenged statements were "inherently improbable."   17 A.5028 (Posttrial Order at 18).   Neither issue supports the finding of actual malice.

### A. Lindell's Purported Hostility Fails to Support a Finding of Actual Malice.

In ruling that Lindell acted with actual malice, the district court improperly focused on Lindell's alleged hostility towards Coomer rather that Lindell's own subjective belief about the truth or falsity of his challenged statements. That is incorrect as a matter of law. For example, in *Talley v. Time, Inc.*, 923 F.3d 878 (10th Cir. 2019), the Tenth Circuit emphasized that "ill will toward the plaintiff, or bad motives *are not elements of the New York Times standard*" and that "[e]vidence of [defendant's] … bias is not enough to show he acted with actual malice." *Id.* at 905 (quotation omitted)(emphasis added). Similarly, in *Harte-Hanks Communications*, the Supreme Court made clear that a media defendant's motive in publishing a story, including its alleged hostility or adversarial intent toward the plaintiff, cannot alone establish actual malice, as the focus is on the defendant's *attitude* toward the truth or falsity of the publication, and *not* their attitude toward the plaintiff. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667-68 (1989).

Based on the foregoing, the district court's reliance on Lindell's alleged hostility toward Coomer is legally insufficient to support its ruling on actual malice. The proper inquiry is whether Lindell subjectively believed that the challenged statements were true.

Furthermore, as set forth below, the evidence is clear that Lindell did believe that truth of his challenged statements. This Court should therefore reject this legally flawed basis for the district court's ruling on actual malice.

### B. The Inherent Improbability of Lindell's Challenged Statements Does Not Support a Finding of Actual Malice in the Absence of Any Evidence that Lindell Seriously Doubted the Truth of Those Statements.

The district court's reliance on its own judgment about the inherent "improbability" of Lindell's challenged statements also fails to support its ruling on actual malice. Here, the record contains no evidence that Lindell entertained serious doubts about the truth of his statements. "The [actual-malice] standard is a subjective one." *Harte-Hanks Communications, Inc.*, 491 U.S. at 688.

In fact, the undisputed evidence is to the contrary. Lindell testified that he relied on sources, including Oltmann's third-party account of what Oltmann heard Coomer say during the Antifa conference call. 14 A.4048-49 (Trial Tr. at 1434-35). Lindell further testified that he hired experts and spent fifty million dollars of his own money investigating the claims on which his statements were based. 16 A.4516-17 (*Id*. at 865-66); 16 A.4585 (*Id*. at 934). This evidence demonstrates Lindell's subjective belief in the truth of his challenged statements.

The district court, however, ignored this clear testimony of Lindell's subjective belief of truthfulness, instead improperly substituting its own judgment about the "inherent improbability" of Lindell's two statements.

But under the law, the district court's own view about the truthfulness of Lindell's challenged statements is not the test, rather the inquiry is whether there is proof that Lindell doubted the truthfulness of the statement. *Talley*, 923 F.3d at 895-97; *Lewis v. McGraw-Hill Broadcasting Company*, 832 P.2d 1118, 1123 (Colo. App. 1992). Here there is no such evidence, and as a result, the district court's second reason for ruling there was actual malice as to Lindell is fatally flawed and should thus be rejected.

### C. The Jury's Finding that Lindell Was not Liable for Punitive Damages Further Supports the Absence of Actual Malice.

The jury was asked "Do you find, beyond a reasonable doubt, that Defendant Lindell acted in a fraudulent, malicious, or willful and wanton manner in causing the Plaintiff's damages?" 10 A.3003 (Lindell Verdict Question 4c). The jury answered no.

The district court rejected Lindell's argument that the jury's confirmation the he did not act willfully or wantonly in causing Coomer's damages defeated Coomer's claim of actual malice against Lindell. 17 A.5025-26 (Posttrial Order at 15-16). Lindell contends that the jury was considering the same evidence when finding that Lindell did not damage Plaintiff either willfully or wantonly. This finding further calls into question the district court's finding as to actual malice.

### D. *The District Court's Ruling that Frankspeech Acted with Actual Malice also Fails as a Matter of Law.*

The same deficiency defeats the conclusion that Frankspeech acted with actual malice. To the extent that Frankspeech is allegedly liable for Lindell's two statements, the district court's ruling on Lindell's actual malice fails for the reasons set forth above. A fortiori, there is no legitimate basis to rule that Frankspeech acted with actual malice as to those two statements by Lindell.

There is also no basis to conclude that Frankspeech acted with actual malice as to Clements's statement at the Symposium. First, as set forth *supra*, Frankspeech is entitled to immunity under Section 230. Second, Coomer's attorney conceded during his opening statement that Clements and Oltmann were free to say whatever they wanted to when they made the decision to speak at the Symposium. 11 A.3151 (Trial Tr. at 30). This concession confirms that there is no basis to find that Clements' statement supported a finding of actual malice as to Frankspeech.

Third, there is no evidence that Frankspeech knew Clements' statements were false or that Frankspeech entertained serious doubts about its truth. Thus, the Court should reject the district court's ruling that there is actual malice as to Frankspeech.

Based on the foregoing, judgment as a matter of law should have been granted on the defamation claims against both Appellants because there is not actual malice as to either Lindell or Frankspeech.

## III.   THE DAMAGE AWARDS SHOULD NOT STAND.

In its Posttrial Order, the district court upheld the jury's award of damages, citing the "continued harassment" against Coomer, Coomer's return to therapy, and the $2.7 million "reputational repair" estimate provided by Bania, Coomer's damages expert.  17 A.5024-25 (Post-trial Order at 14-15).  None of these justify the affirmance of the damage awards.

### A.   The Damages Award is Fatally Flawed for a Number of Reasons.

In its March 25, 2026 Posttrial Order, the district court noted that Defendants' position was that Coomer's reputation was already "destroyed" by statements made by other parties, principally by non-party Oltmann, before Lindell or Frankspeech made any of the statements found to be defamatory.  17 A.5025 (Posttrial Order at 14).

Defendants' position was confirmed by Coomer's  testimony.  He expressly admitted that Coomer's reputation had been "destroyed" by Oltmann as well as twenty-five other people who had rebroadcast Oltmann's statements before the statements at issue here, that Coomer had sued those twenty-five individuals, and that Oltmann's statements had been published "hundreds of times before Lindell interviewed Oltmann."  12 A.3415-18 (Trial Tr. at 294-97).

Coomer further testified that:

Q. Your reputation was shattered long before Mr. Lindell said a word about you; isn't that correct?

A. Yes.

12 A.3419 (Trial Tr. at 298).

Coomer, however, never produced any evidence that would enable the jury to separate the substantial harm to his reputation he conceded had been caused by twenty-five others versus the harm allegedly caused by Lindell or Frankspeech. Thus, the amount of damages awarded is speculative at best.

Nor did Coomer ever proffer any evidence to sort out the clear causation issues regarding the destruction and shattering of his reputation undisputedly caused by those other persons from the damage, if any, caused by Lindell and Clements' subsequent statements.

Furthermore, Coomer's testimony reveals the cookie-cutter nature of all of the other lawsuits. Coomer conceded that that in all twenty-five of the other defamation lawsuits he filed, he had also claimed emotional distress, reputational and punitive damages, and that his safety had been "jeopardized." 12 A.3415-16 (Trial Tr. at 294-95). Coomer further acknowledged that he had used similar language to describe the defendants' alleged misconduct in all of those other cases. 12 A.3417 (Trial Tr. at 296).

Coomer also admitted that he began to experience harassment, threats, and started therapy *before* the statements at issue here:

Q. Dr. Coomer, you mentioned that Mr. Oltmann first started making accusations against you in November of 2020, correct?

A. Yes, that's when it started.

Q. And those accusations were public, weren't they?

A. Yes.

Q. And that was several months before Mr. Lindell made any statements about you on Frankspeech, wasn't it?

A. Yes.

Q. During that time, from November 2020 until May 2021, were you already experiencing harassment and threats?

A. Yes, I was.

Q. And you had already started seeing your therapist again by that point?

A. I believe so, yes.[1]

12 A.3433-35 (Trial Tr. at 312-14).

Coomer also failed to provide any testimony or other evidence to demonstrate the existence of any pecuniary loss. 11 A.3170-3310, 12 A.3311-20 (Trial Tr. 44-199); 12 A.3368-3471 (*Id*. at 247-350). For example, Coomer did not testify about, much less proffer any evidence to quantify, any lost income, lost employment opportunities, lost business, or out-of-pocket expenses attributable to the challenged

---

[1] Given that Plaintiff admitted that this all began *before* the statements at issue here, the jury should have been instructed that they could also factor that in when considering causation and any alleged damages.

statements made by Lindell or Frankspeech. *See generally id.* Nor did any other witness testify that Coomer's suffered any economic loss. As a result, the Court should vacate the award of economic damages.

Coomer's absolute failure of proof regarding the cause and amount of damages purportedly related to Lindell and Frankspeech versus the amount and cause of damages pertaining to the other twenty-five other individuals is clearly reflected in one of the questions that the jury asked the judge: "Can the jury defer the damages awarded to the plaintiff to the judge due to a lack of expertise/evidence?" 18 A.5257-64 (Courtroom Minutes with jury questions).

Given Coomer's admissions about the prior alleged reputational and other negative effects purportedly caused by the other individuals occurring before the statements at issue here, the damages awarded by the jury are clearly untenable and the Court should strike them. *See* Robert D. Sack, *Sack on Defamation*, §§ 10.5.3, 10.5.5.2 (3d ed. 2007)(noting that "[t]he fact plaintiff already had a bad reputation tends to show that his or her reputation has not been substantially affected by additional derogatory communication").

## B. The Testimony of Coomer's Damages Expert Fails to Support a Viable Damages Award.

Coomer's damages expert, Doug Bania, testified that it would cost approximately $2.7 million for Coomer to conduct a "reputational repair program" involving search engine optimization and remediation, social media management,

and related efforts to restore Coomer's public image.  14 A.4009-12 (Trial Tr. at 1395-98).  Bania's testimony fails for several reasons.

First, Bania acknowledged that his $2.7 million "reputational repair" opinion was not tethered to any identified injury.  14 A.4022 (Trial Tr. at 1408).  Bania admitted he was "not providing any opinions" about whether Lindell's challenged statements had any substantial impact on Coomer's reputation and that Bania was not quantifying any actual reputational harm suffered.  14 A.4022 (*Id.* at 1408).  He admitted his opinion was untethered from any actual harm. Because Bania never identified, measured, or quantified the reputational injury he claimed to be repairing, his opinions amounted to speculation rather than a reliable expert methodology, and they should have been excluded under Rule 702.

Second, Bania's damages estimate lacked foundation.  During cross-examination, Defendants' counsel made multiple foundation objections regarding the Bania's assumptions about projected search volume, public opinion trends, platform comparisons, and the effectiveness of various repair strategies, and what the harm actually was.  Several of these objections were sustained by the district court. 11 A.3184, A.3190-92, A.3195-96 (Trial Tr. at 63, 69-71, 74-75).  Expert testimony that lacks adequate foundation cannot support a damages award.

Third, Bania purported to measure the alleged cost to repair the purported damage to Coomer's reputation without providing any method to allocate the cost

of repairing the damage, if any, caused by the statements at issue here versus the cost of repairing the admitted damage to Coomer's reputation caused by Oltmann and the twenty-five other individuals he sued. *See generally* 14 A.3962-4046 (Trial Tr. at 1348-1432). In fact, Bania had been instructed not consider the preexisting harm caused by Oltmann and twenty-five other individuals who Coomer admitted had "destroyed" and "shattered" his reputation. 12 A.3415-19 (Trial Tr. at 294-98). In the absence of such a mechanism to distinguish the damages allegedly attributable to the statements at issue here, Bania's damages calculation is essentially throwing darts at a board.

Fourth, Bania's damages estimate was based in part on statements that the jury found were not defamatory. *Compare* 14 A.3981-82 (Trial Tr. at 1367-68) (basing estimate on ten defamatory statements that went to the jury), *with* 10 A.3007-09, 11 A.3010 (Frankspeech Verdict Form)(finding three statements defamatory). This further undermines the validity of his views on damages.

Fifth, Bania reached the figure of $2.7 million simply calculated the amount of money needed to drive internet users to a website intended to correct Coomer's alleged reputational harm. 14 A.4002, A.4015 (Trial Tr. at 1388, 1401). Bania instead simply came up with a number of pay per click costs, assuming that hundreds of thousands of people searching the internet would specifically search for Coomer's

name.  14 A.3999-4005 (Trial Tr. at 1385-91).  This is yet another reason that the district court should have excluded Bania's testimony as unreliable.

### C.  *The Punitive Damages Award Against Frankspeech Should Be Reversed.*

The jury awarded in $300,000.00 in punitive damages against Frankspeech. 10 A.3009 (Frankspeech Jury Verdict).  However, the jury made no punitive damages award against Lindell.  10 A.3005 (Lindell Jury Verdict).  The jury's failure to award any punitive damages against Lindell eviscerates the jury's award of punitive damages against Frankspeech to the extent it was based on Lindell's conduct because Frankspeech can only act through natural persons.

Based on the jury's findings, Clements is the only other individual whose conduct could possibly support a punitive damages award against Frankspeech. Coomer never introduced any evidence regarding Clements that would support the award of punitive damages.

As a result, there is no legitimate grounds for the punitive damages award and that award should be reversed.

### IV.  THE JURY'S VERDICT FINDING FRANKSPEECH LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS TO MEET THE REQUISITE LEVEL OF EXTREME AND OUTRAGEOUS CONDUCT.

In its Order denying Defendants' motion for summary judgment, the district court ruled that Coomer's IIED claim could proceed to trial against Lindell and Frankspeech.  8 A.2146, A.2154 (Summary Judgment Order at 8, 16).  As to

Frankspeech, the court allowed the IIED claim to go forward because it determined that there was sufficient evidence that a reasonable jury could conclude Lindell acted as the agent or alter ego of Frankspeech. 8 A.2154 (*Id*. at 16). Thus, the sole viable basis on which the jury could conclude that Frankspeech was liable for IIED was if Lindell (or some other individual acting on behalf of Frankspeech) were also found liable for the claim.

The jury found that Frankspeech was liable on the IIED claim. 10 A.3008 (Frankspeech Jury Verdict). The jury, however, found that Lindell was not liable on the IIED claim. 10 A.3005 (Lindell Verdict Form). Thus, the jury necessarily determined Lindell's statements and conduct did not meet the requisite level of extreme and outrageous conduct required to support an IIED claim. Given that finding of no liability, the IIED claim against Frankspeech cannot be based on any conduct by Lindell as a matter of law.

Based on the jury's other findings regarding the allegedly defamatory statements, the only other individual on whom the IIED claim against Frankspeech could be based is Clements as he was the only other person who the jury concluded made a defamatory statement. 10 A.3008 (Frankspeech Jury Verdict). As set forth above, there is no basis to find that Clements was an agent of Frankspeech. As a result, there is no viable basis to find that Frankspeech is liable for Clement's conduct.

Because a corporation can act only through natural persons, the absence of any natural person whose conduct satisfies the elements of the IIED claim is fatal to the verdict against Frankspeech. Based on the foregoing, the Court should find that Frankspeech was not liable for IIED as a matter of law and reverse on this claim.

## CONCLUSION

For the foregoing reasons, Appellants Lindell and Frankspeech LLC ask the Court to reverse judgment in favor of Coomer and enter judgment in favor of Appellants on all of Coomer's claims as a matter of law.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Oral argument is warranted because it would materially assist the Court. Oral argument would provide an opportunity to amplify any issues insufficiently addressed in the Opening Brief or questions of the Court to ensure that the Court is properly apprised of all relevant facts, a possibility because of the complexity of this trial and the Constitutional issues raised therein.

Respectfully Submitted,

**BERENS & MILLER, P.A.**

**SIGNED:** June 22, 2026          By */s/ Barbara Berens*
Barbara Berens (MN# 209788)
80 South 8th Street, Suite 3720
Minneapolis, MN 55402
(612) 688-6516
Barbara Berens, Esq.

## LIST OF ATTACHED ORDERS AND RELEVANT TRANSCRIPT

*Page*              *Description*

46                  (ECF 261) Summary Judgment Order : August 29, 2024

81                  (ECF 381) Final Judgment Order: June 26, 2024

83                  (ECF 413) Court's Second Sanctions Order: May 7, 2026

**CERTIFICATE OF COMPLIANCE**

**I HEREBY CERTIFY** that this Appellants' Opening Brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B). Specifically, this brief contains 9437 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). In making this certification, I relied on the word count generated by the word processor, Word 2016, to prepare the brief.

**SIGNED:** June 22, 2026                    By */s/ Barbara Berens*

**10th Cir. R. 31.3(B) CERTIFICATE OF SEPARATE BRIEFS**

Appellants are attorneys for Appellants Michael Lindell and FrankSpeech LLC. 10th Cir. R.31.3(A) applies to allow separate briefing among the two Appellant groups. I certify that a separate brief in this appeal is required on behalf of these Appellants for a number of reasons. First, Appellants are…... Such focus requires that Appellant attorneys be able to address their set of alleged facts, and as distinct from Appellants' attorneys who will have different facts and arguments to present. Appellants' argument differs in kind and in fact and law from that applicable to other Appellants given that different roles and facts apply to them in the sanctions orders. Lastly, there would be confusion in a single brief because of the word limits in trying to explain unrelated facts and different issues before the Court. This would prejudice both sets of Appellants. Hence, a separate Appellants' Opening Brief is both warranted and efficient.

**SIGNED:** June 22, 2026                    By */s/ Barbara Berens*

**CERTIFICATE OF DIGITAL SUBMISSION**

**I HEREBY CERTIFY** that the version of this Appellants' Opening Brief submitted in Digital Form via the Court's ECF system is an exact copy of the written document to be filed with the Clerk and all required privacy redactions have been made. I further certify that the brief has been scanned for viruses and according the program, is free of Viruses.

**SIGNED:** June 22, 2026                    By */s/ Barbara Berens*

## CERTIFICATE OF SERVICE

I, Barbara P. Berens, Esq., hereby certify that on this day, June 22, 2026, I electronically transmitted this APPELLANTS' OPENING BRIEF to the Clerk of the Court using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Morgan, Ashley D. | amorgan@cstrial.com |
| Kloewer, Brad | bkloewer@cstrial.com |
| Cain, Charles J | ccain@cstrial.com |
| Beller, David Matthew | david@rklawpc.com |
| Rogers, Thomas Melvin III | trey@rklawpc.com |

**SIGNED:** June 22, 2026          By */s/ Barbara Berens*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

      Defendants.

---

### MEMORANDUM OPINION AND ORDER

---

This matter comes before the Court on the following motions:

(1)    Defendants' Omnibus Motion for Summary Judgment (the "Motion for Summary Judgment"), [Doc. 177, filed September 8, 2023];

(2)    Defendants' Motion to Exclude Testimony of J. Alex Halderman (the "Motion to Exclude"), [Doc. 188, filed September 19, 2023]; and

(3)    Plaintiff's Objec[t]ion to Defendants['] Designation of Nonparties at Fault and Motion to Strike Designation (the "Motion to Strike"), [Doc. 216, filed October 26, 2023].

The Court finds that oral argument would not materially assist in the disposition of these motions. Upon review of the Parties' briefing, the entire docket, and the applicable case law, this Court respectfully **DENIES** the Motion for Summary Judgment, **GRANTS in part** and **DENIES in part** the Motion to Exclude, and **GRANTS** the Motion to Strike.

A.2139

## BACKGROUND

Plaintiff initiated this lawsuit on April 4, 2022, in the District Court of Denver County, Colorado, against Defendants Michael J. Lindell ("Mr. Lindell"), Frankspeech LLC ("Frankspeech"), and My Pillow, Inc. ("MyPillow"). [Doc. 4]. Defendants removed the case to federal court on May 5, 2022. [Doc. 1]. On June 17, 2022, Dr. Coomer filed a First Amended Complaint and Jury Demand (the "First Amended Complaint") to add additional allegations of conduct arising since the inception of the lawsuit. [Doc. 21]. Defendants moved to dismiss each of the claims asserted in the First Amended Complaint under Rule 12(b)(6). *See generally* [Doc. 38]. After full briefing on the merits, this Court denied Defendants' Motion to Dismiss on March 15, 2023. [Doc. 119]. Then, on April 6, 2023, Plaintiff sought leave to further amend his operative pleading to include additional facts and to assert a demand for exemplary damages. [Doc. 127]. On July 7, 2023, this Court granted Plaintiff leave to file his Second Amended Complaint and Jury Demand (the "Second Amended Complaint") and ordered Defendants to file an answer to the Second Amended Complaint no later than July 21, 2023. [Doc. 169]. On July 21, 2023, Defendants answered the Second Amended Complaint. [Doc. 171]. On October 5, 2023, Defendants filed a designation of nonparties at fault. [Doc. 199].

The Court has previously summarized the factual background of Plaintiff's allegations at length, *see, e.g.*, [Doc. 119 at 1–5; Doc. 197 at 3–7], and need not repeat it here. In essence, Dr. Coomer has sued Defendants for linking Dr. Coomer, a former employee of Dominion Voting Systems, Inc. ("Dominion"), to election interference by publicizing allegedly false and defamatory statements, originating with nonparty Joseph Oltmann ("Mr. Oltmann"), that Dr. Coomer supposedly assured an "Antifa conference call" that he had "made . . . sure" former President Donald J. Trump would not win the 2020

2

A.2140

presidential election. *See* [Doc. 170 at ¶ 29]. In his Second Amended Complaint, Plaintiff asserts three causes of action against Defendants: (1) defamation, (2) intentional infliction of emotional distress ("IIED"), and (3) civil conspiracy. [*Id.* at ¶¶ 146–59]. The Second Amended Complaint also includes demands for permanent injunctive relief as well as exemplary damages. [*Id.* at ¶¶ 160–174]. Dr. Coomer alleges that, as a result of Defendants' conduct, he has faced "an onslaught of harassment and credible death threats issued against him; he is at risk in his home or in going to work; [and] his presence puts his family, friends, colleagues, and his community in danger." [*Id.* at ¶ 152]. He further avers that, as a direct and proximate result of Defendants' conduct, he has "suffered significant actual and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss." [*Id.* at ¶¶ 154, 159]; *see also* [*id.* at ¶ 150 ("As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, harm to his reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.")].

Defendants have now moved for summary judgment as to all Plaintiff's claims, as well as to exclude certain opinions by Plaintiff's expert witness Dr. J. Alex Halderman ("Dr. Halderman") from trial. [Doc. 177; Doc. 188]. Meanwhile, Plaintiff has moved to strike Defendants' designations of nonparties at fault. [Doc. 216]. All motions are fully briefed and ripe for decision.

## LEGAL STANDARDS

### I.    Motion for Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotations omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016) (quotation omitted).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (4th ed. April 2023 update) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or the denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For

4

A.2142

instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## II.    Motion to Exclude

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As noted by the Advisory Committee when the Rule was first promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony or evidence admitted is not only relevant, but also reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that

5

A.2143

gatekeeper function, courts within the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") conduct a two-part inquiry. First, courts consider whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by assessing the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005)). Second, courts look at whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See id.* The party offering the expert opinion bears the burden of establishing its admissibility, including all foundational requirements, by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (en banc); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* The analysis is opinion-centric, rather than expert-centric. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1250–51 (D. Colo. 2009).

6

A.2144

Additionally, although an expert witness's testimony must assist the jury to be deemed admissible, Fed. R. Evid. 702(a), it may not usurp the jury's fact-finding function, *see Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988). Nevertheless, "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 809. Such testimony "is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *Id.* at 809–10. If "the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based," however, "the testimony cannot be allowed." *Id.* at 810. Testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible. *Id.* at 808. Additionally, although the line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, it is settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

### III.    Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure states that a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(1). "[B]oth Colorado courts and courts of this District recognize the designation of a nonparty at fault as a pleading." *McGraw v. Cobra Trucking Inc.*, No. 20-cv-01032-NYW, 2020 WL 7230637, at *3 n.2 (D. Colo. Dec. 8, 2020) (citing cases); *see also Moore v. Banta*, No. 14-cv-00143-REB-MJW, 2015 WL 859506, at *1 (D. Colo. Jan. 29, 2015), *report and recommendation adopted*, 2015 WL 849194 (D. Colo. Feb. 25, 2015).

A.2145

## ANALYSIS

### I.    Motion for Summary Judgment

In the Motion for Summary Judgment, Defendants argue (1) that the allegedly defamatory statements at issue are not actionable; (2) that the allegedly defamatory statements did not cause Plaintiff actual damages; (3) that Defendant MyPillow is not liable on the defamation claim; (4) that Plaintiff cannot meet his burden with respect to demonstrating actual malice; (5) that the claims for IIED and civil conspiracy cannot survive summary judgment; (6) that Plaintiff cannot obtain permanent injunctive relief; and (7) that Plaintiff has offered insufficient evidence in support of his attempt to recover exemplary damages. [Doc. 177]. Accordingly, Defendants seek summary judgment on all claims in the Second Amended Complaint.

The Parties list more than one-hundred material facts—many with multiple components—across over one-hundred pages of briefing, with dozens of voluminous supporting exhibits. *See generally* [*id.*]; *see also* [Doc. 235]. However, it appears that most of these statements of fact are not germane to the contested issues raised in the Motion for Summary Judgment. Rather than assess at length which facts are undisputed for purposes of the summary-judgment record and to what extent, the Court focuses only on those facts and legal issues that are essential to considering Defendants' various arguments. For the reasons that follow, the Motion for Summary Judgment is respectfully **DENIED**.

A.2146

## A.    Actionability of Statements

Defendants contend that the allegedly defamatory statements in the Second Amended Complaint are not actionable as a matter of law in Plaintiff's claim for defamation.  [Doc. 177 at 18–19].  Specifically, Defendants single out the following statements:   (1) that Dr. Coomer is "corrupt"; (2) that Mr. Lindell is "up against" "corruption"; (3) that Mr. Lindell has never talked about Dr. Coomer; (4) that Dr. Coomer is the "president of Dominion"; (5) that Dominion is a "criminal crime family"; (6) that Dr. Coomer is "a criminal"; (7) that MyPillow does not know who Dr. Coomer is; (7) that Dr. Coomer did a "very, very stupid move"; (8) that Dr. Coomer will be "behind bars"; (9) that Georgia Secretary of State Brad Raffensperger will be "behind bars"; (10) that Colorado Secretary of State Jena Griswold will be "behind bars"; (11) that Dr. Coomer is "disgusting"; (12) that Dr. Coomer "belong[s] behind bars"; (13) that Dr. Coomer "ran into a building drunk the other day"; (14) that Dr. Coomer has "been a part of the biggest crime this world has ever seen"; (15) that Dr. Coomer "even said what [he] did or [he was] going to do"; (16) that Dr. Coomer is "evil"; (17) that Dr. Coomer "did crimes against the United States"; and (18) that Dr. Coomer "did crimes against . . . quite frankly all of humanity." [*Id.*].  Defendants variously argue that these statements are not actionable because they are protected opinion, hyperbolic, vague, predictive, about nonparties, or substantially true.  [*Id.* at 19–29].

For two significant reasons, Defendants' actionability argument fails.  First, Defendants contend that Dr. Coomer "cannot meet his burden [to show actionability] for *each statement* he identifies in the Second Amended Complaint," [Doc. 177 at 18 (emphasis added)], but, as Plaintiff points out, Defendants' argument is limited to a single

9

A.2147

publication by Mr. Lindell from April 6, 2022, *see* [Doc. 235 at 24]; *see also* [Doc. 170 at ¶¶ 103–04], and the Second Amended Complaint covers numerous other allegedly defamatory publications by or potentially attributable to Defendants from between 2021 and 2023, *see, e.g.*, [Doc. 170 at ¶¶ 54–61, 63–65, 81–92, 100–02, 106–09, 116, 119–23, 125–30].[1]  Accordingly, the actionability argument is not dispositive, and the Court proceeds only to the extent that Defendants seek partial summary judgment as to the actionability of select statements alleged in the Second Amended Complaint.  *See* Fed. R. Civ. P. 56(a) (permitting a party to obtain summary judgment on "part of" a "claim or defense").

Second, turning to the statements themselves, Defendants' argument misses the forest for the trees by ignoring the context that a reasonable jury could foreseeably attribute to Mr. Lindell's comments.  *See Zia Shadows, L.L.C.*, 829 F.3d at 1236 (on summary judgment, courts must "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant").  Construing the summary-judgment record in Plaintiff's favor as it must, this Court finds that a reasonable factfinder could conclude that that every word or phrase isolated by Defendants as part of their limited argument against actionability ought to be understood in the context of the

---

[1] Defendants' Reply does not address this argument; indeed, the Reply entirely declines to revisit the actionability arguments that open the Motion for Summary Judgment.  *See generally* [Doc. 248].  Instead, Defendants' Reply principally argues that Dr. Coomer "cannot clearly and convincingly prove that the Dominion computerized voting system, which he had a role in designing, did not allow for the manipulation of cast votes in the 2020 presidential election without evidence of how the system functioned during the 2020 election."  [*Id.* at 4–8 (footnote omitted)].  This argument was not raised in the Motion for Summary Judgment and is therefore waived. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011); *Ulibarri v. City & Cnty. of Denver*, 742 F. Supp. 2d 1192, 1218 (D. Colo. 2010).

A.2148

overarching and allegedly defamatory factual claim that Dr. Coomer rigged or otherwise interfered with the 2020 election.  The record on summary judgment contains sufficient evidence to lead a reasonable factfinder in this direction.  *See, e.g.*, [Doc. 235-1 at 1–2; Doc. 235-2 at ¶¶ 27–29]; *see also Burns v. McGraw-Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983) ("[O]pinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation.").   This Court has previously recognized that this contention provides a basis for defamation liability, concluding at the motion-to-dismiss stage that the statements at issue in this litigation "are sufficiently factual to be susceptible of being proved true or false" because "Dr. Coomer's actions with regard to the Dominion voting machines either interfered in the 2020 presidential election or they did not."  *See* [Doc. 119 at 16].  Indeed, the Court accepted Defendants' argument that a higher showing of actual malice must be made on Plaintiff's defamation claim precisely because the statements at issue concern election integrity, which is a matter of public concern.  [*Id.* at 8–10].  To the extent that Defendants dispute whether Mr. Lindell was discussing election fraud or, instead, Dr. Coomer's settlement with Newsmax, *see, e.g.*, [Doc. 177 at 23], that only serves to create a dispute of material fact for the jury to resolve—as Defendants appear to acknowledge in their Reply, *see* [Doc. 248 at 2]—or to draw attention to matters that the jury must be carefully instructed about.  Either way, summary judgment on the actionability of select statements in the Second Amended Complaint is unmerited.

### B.    Causation

Next, Defendants argue that Dr. Coomer cannot show actual damages on his defamation claim because—due to other individuals and entities spreading the same

11

A.2149

allegedly defamatory message about Dr. Coomer which originated with Mr. Oltmann—any damages suffered predate, or are otherwise not fairly traceable to, Defendants' conduct. *See* [Doc. 177 at 29–33]. Plaintiff responds that republication gives rise to new damages and that Defendants' publications have been "uniquely damaging" to him. [Doc. 235 at 32].

The Court respectfully concludes that Defendants' causation argument, while highly relevant to calculating any potential award of damages at trial, does not compel summary judgment. That is because Dr. Coomer has adduced sufficient evidence to create triable issues of fact as to whether he suffered or continues to suffer actual damages caused by Defendants' allegedly defamatory publications. *See, e.g.*, [Doc. 235-2 at ¶¶ 30–31, 37; Doc. 235-22 at 47:12–25].[2] Specifically, Plaintiff has introduced evidence of continued harassment and targeting that a reasonable jury could connect with Defendants' alleged defamation based on the timing of the harassment and record evidence of large audiences for events like the Cyber Symposium. *See, e.g.*, [Doc. 236-5; Doc. 235-26 at 2; Doc. 235-40 at 2]. And Plaintiff refers the Court to deposition testimony from his therapist concerning his deteriorated condition in August 2021 immediately following Defendants' Cyber Symposium. *See* [Doc. 235-25 at 253:5–254:20]. Accordingly, the record supports submitting the intertwined issues of actual damages and causation to the jury. *Cf. Keohane v. Stewart*, 882 P.2d 1293, 1305 (Colo. 1994) (recognizing that "[c]laims for damages for emotional distress are inherently difficult to prove with certainty, to rebut, and to evaluate").

---

[2] When citing to transcripts, the Court cites to the document number generated by the CM/ECF system and to the page and line numbers appearing on the original transcript.

A.2150

### C.    MyPillow's Liability

Defendants argue that summary judgment should be granted on the defamation claim against MyPillow because "MyPillow never published, authorized, or ratified any statements about Coomer." [Doc. 177 at 33]. Specifically, Defendants contend that no speaker acted as MyPillow's agent, that MyPillow did not ratify any of the statements at issue, and that the statements at issue are not defamatory. [*Id.* at 34–37]. Plaintiff responds that MyPillow is responsible for the statements at issue both independently and under agency principles, that MyPillow ratified the statements, and that the statements are defamatory. [Doc. 235 at 36–41].

This Court respectfully concludes that summary judgment in MyPillow's favor with respect to vicarious liability is not appropriate on this record. In Colorado, "the existence of an agency relationship is ordinarily a question of fact to be determined by the fact finder," although an exception exists where "there is no dispute or conflict in the facts which are alleged to have created the agency." *Victorio Realty Grp., Inc. v. Ironwood IX*, 713 P.2d 424, 425 (Colo. App. 1985). The doctrine of respondeat superior is subject to similar treatment. *See Gordon v. Boyles*, 99 P.3d 75, 82 (Colo. App. 2004) (denying summary judgment because "evidence regarding [the employee's] typical duties and responsibilities . . . raises a question of material fact as to whether [his] publications were considered within the scope of his employment for purposes of [vicarious] liability under a theory of respondeat superior"). Here, the Parties' briefing and argument reveals the potential for the factfinder to reasonably draw conflicting inferences from the record, which precludes summary judgment. *See Shoemaker v. Mountain States Tel. & Tel. Co.*, 559 P.2d 721, 724 (Colo. App. 1976) ("Conflicting inferences might be drawn by a trier of fact,

A.2151

and we conclude accordingly that the trial court erred in resolving this issue on a summary judgment motion. This is especially true where divergent inferences could be drawn from apparently undisputed facts."). For example, Defendants challenge the proper interpretation of several facts that bear on whether MyPillow may be held liable because they involve the relationship between MyPillow employees and the Cyber Symposium and the extent to which Mr. Lindell used MyPillow to promote his political beliefs, among other issues. *Compare* [Doc. 235 at ¶¶ 50–51, 53, 55, 62–63, 65], *with* [Doc. 248 at ¶¶ 50–51, 53, 55, 62–63, 65]. Accordingly, summary judgment will not be granted as to vicarious liability. And, with respect to Defendants' secondary argument that certain statements attributed to MyPillow through an agency relationship in the Second Amended Complaint are not defamatory, the Court reiterates that, as discussed above, Defendants fail to acknowledge the numerous other statements ascribed to MyPillow that unambiguously connect Plaintiff to election interference, as well as the overarching narrative of Defendants' statements with respect to Dr. Coomer. The jury must determine at trial which statements attributable to MyPillow, if any, rise to the level of recoverable defamation.

### D.    Actual Malice

Defendants contend that Plaintiff has failed to adduce sufficient evidence of actual malice, so summary judgment is warranted. [Doc. 177 at 37–46]. Plaintiff disagrees, presenting evidence and argument with respect to a host of factors which courts deem relevant to the actual-malice inquiry. *See* [Doc. 235 at 41–47]. In their Reply, Defendants appear to acknowledge that Plaintiff has met his summary-judgment burden and that genuine disputes of material fact preclude summary judgment as to this issue. *See* [Doc.

14

A.2152

248 at 4 ("Except for facts bearing on the truth or falsehood of Defendants' challenged statements and any actual malice of Defendants in making those statements, the disputed facts are immaterial to the issue posed by this Court as the central issue in this litigation.")].[3]  Insofar as Defendants have not conceded this argument, the Court finds upon "independent review," *see Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1049 (10th Cir. 2013), that the summary-judgment record, construed in Plaintiff's favor, contains ample support for a reasonable jury finding of actual malice by clear and convincing evidence—including for some of the reasons discussed in the Order on Motion to Dismiss.  *See* [Doc. 119 at 11–14].

As this Court has explained, "[a] statement is published with actual malice if it is published with actual knowledge that it was false or with reckless disregard for whether it was true."  [*Id.* at 11 (quoting *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1288 (Colo. App. 2022))].  Record evidence of the legitimacy of the 2020 election and evidence that undermines the reasonableness of Defendants' beliefs to the contrary plays into the reckless-disregard component of the actual-malice inquiry.  *See, e.g.*, [Doc. 235-23 at ¶¶ 25–67; Doc. 236-4]; *see also Coomer v. Donald J. Trump for Pres., Inc.*, 552 P.3d 562, 596 (Colo. App. 2024) (evidence of election integrity was "one piece of evidence that could support a finding of actual malice" in suit by Dr. Coomer bringing similar claims).  The Court also notes Defendants' repetition of the statements giving rise to this dispute "multiple times

---

[3] The Reply abandons the Motion for Summary Judgment's approach in exchange for a different actual-malice argument:  that "Defendants did not act with actual malice because they knew that [another] court had stated that national cybersecurity experts had concluded that interference in the outcome of an election as a result of the design of the Dominion computerized voting system was certain to occur at some point."  [Doc. 248 at 8–9].  To the extent this is a cognizable summary-judgment argument, it is waived.  *See Reedy*, 660 F.3d at 1274; *Ulibarri*, 742 F. Supp. 2d at 1218.

A.2153

after being sued." *See* [Doc. 235 at 50]; *see also, e.g.*, [Doc. 170 at ¶ 116; Doc. 177 at ¶ 43; Doc. 235-1 at 1]. At most, the evidence and arguments give rise to disputes of material fact that preclude summary judgment. *See, e.g.*, [Doc. 235-12 at 46–58 (Dr. Halderman's expert opinions about Mr. Oltmann's views); Doc. 235-16 at 142:10–146:25 (testimony by Frankspeech anchor suggesting lack of due diligence with respect to publication of statements concerning Dr. Coomer); Doc. 235-37 at 4 (Mr. Lindell's answers to requests for admission with respect to his basis for connecting Dr. Coomer to election interference)]. Defendants thus fail to persuade the Court that the record is insufficiently developed or contested to warrant taking the issue of actual malice away from the jury.

### E.    Other Claims

*IIED.* Defendants' arguments with respect to Dr. Coomer's claim for intentional infliction of emotional distress are largely derivative of arguments the Court has already rejected. *See* [Doc. 177 at 46 (arguing that "Defendants' statements are constitutionally protected speech and immune from tort liability," and that "Defendants also did not act recklessly, as discussed . . . in the context of an absence of 'actual malice'")]. This Court has already rejected the legal argument that Plaintiff's allegations do not create a triable jury question as to IIED, *see* [Doc. 119 at 24–26], and the summary-judgment evidence as to Dr. Coomer's emotional distress does not support revisiting this determination when construed in Plaintiff's favor, *see, e.g.*, [Doc. 235-2 at ¶¶ 30–31, 37; Doc. 235-22 at 47:12–25].

*Civil Conspiracy.* A claim for civil conspiracy has five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished;

A.2154

(3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006) (quotation omitted). Defendants principally argue that Plaintiff cannot show a conspiracy between multiple actors because "the conspiracy alleged here is predicated on the 'agreement' of one human being with himself: Mr. Lindell, in his personal capacity; Mr. Lindell, in his capacity as CEO of MyPillow, the pillow company; and Mr. Lindell, in his capacity as CEO of Frankspeech, the media company." [Doc. 177 at 47–48]. Plaintiff responds that "[m]ultiple individuals working on behalf of both MyPillow and FrankSpeech worked together to accomplish, promote, and distribute the publications at issue here." [Doc. 235 at 48–49]. While Defendants' authority supports the proposition that a corporation cannot conspire with itself, *Dildine v. Saxon*, No. 2014CV34753, 2016 WL 9450273, at *4 (Colo. Dist. Ct. Denver Cnty. Apr. 14, 2016), Defendants fail to direct the Court to undisputed facts in the summary-judgment record that suggest Defendants should all be treated as the same unit for civil conspiracy purposes under applicable law, or that a formal agreement is required to proceed on a civil conspiracy claim, *see* [Doc. 177 at 47–48]. Defendants also argue that Dr. Coomer cannot show any unlawful overt acts because their speech was protected by the First Amendment and because Plaintiff has no evidence of damages, [*id.* at 48], but the Court has already rejected these arguments at the summary-judgment stage in the context of Plaintiff's defamation claim. Should Plaintiff's defamation claim fail at trial, these arguments may of course be renewed.

   ***Permanent Injunction.*** Defendants argue that summary judgment on Plaintiff's request for injunctive relief is appropriate because they have not engaged in defamation.

[Doc. 177 at 48]; *see also* [Doc. 235 at 49 (Plaintiff noting that "Defendants' argument for summary judgment on this claim is premised entirely on their assertion that they made no defamatory statements")].   Having declined to grant summary judgment with respect to the underlying defamation claim, the Court rejects this contention at this stage.

**Exemplary Damages.**  Colorado law permits a jury to award exemplary damages where "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."  Colo. Rev. Stat. § 13-21-102(1)(a).  "Willful and wanton" conduct is defined by statute as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  *Id.* § 13-21-102(1)(b). Defendants argue that Plaintiff has adduced insufficient evidence to submit the issue of exemplary damages to the jury.   [Doc. 177 at 48–50].   Plaintiff responds that—as Defendants recognize, [*id.* at 49]—"malice" for purposes of Colorado law encompasses "vindictiveness and retaliatory motives," [Doc. 235 at 49–50 (quotation omitted)].

The Court respectfully agrees with Plaintiff that evidence of a retaliatory motive supports the claim for exemplary damages here.  *See* [*id.* at 50].  Defendants themselves have introduced evidence that Mr. Lindell was driven by frustration with what he perceived as Dr. Coomer's interference with his ability to advertise MyPillow products.  *See, e.g.*, [Doc. 177 at ¶¶ 32–34 (citing [Doc. 177-9 at 18:15–19:11; Doc. 177-10 at 138:11–17])]. The genuine issues of material fact with respect to actual malice discussed above also inform the Court's determination that Defendants have failed to show their entitlement to summary judgment.   So does Defendants' continuing course of allegedly defamatory conduct, which the Court previously discussed in permitting Plaintiff to add the claim for

A.2156

exemplary damages.  *See* [Doc. 169 at 14–15].  Construed in the nonmovant's favor, the Court finds sufficient evidence has been presented at the summary-judgment stage to submit the issue of exemplary damages to the jury.

The Motion for Summary Judgment is respectfully **DENIED** as to all issues and claims.  At the Telephonic Status Conference on October 2, 2024, this matter will be set for a Final Pretrial/Trial Preparation Conference as well as trial.  [Doc. 257].

## II.    Motion to Exclude

In the Motion to Exclude, Defendants seek to bar Dr. Halderman, an expert witness disclosed by Plaintiff, from testifying at trial as to a variety of opinions previewed in his Declaration, [Doc. 189], and deposition testimony, [Doc. 188-3], based on concerns involving relevance, prejudice, and various other evidentiary principles.  Defendants do not appear to question Dr. Halderman's qualifications as "an expert in election cybersecurity," nor do they raise any methodological concerns with how he reached his opinions.  *See generally* [Doc. 188].  For the reasons that follow, the Motion to Exclude is **GRANTED in part** and **DENIED in part**.  The Court's ruling as to each of Dr. Halderman's disputed opinions follows.

### A.    *Absolute Proof*, *Absolute Interference*, and *Absolute 9-0*

Defendants first attempt to draw a distinction between claims that Dr. Coomer or Dominion interfered with the election (the "Dominion Claims") and claims that China interfered with the election (the "China Claims"), arguing that three videos published by Mr. Lindell—tilted *Absolute Proof*, *Absolute Interference*, and *Absolute 9-0*—only concern the latter theory, so Dr. Halderman's opinions with respect to them should be excluded because they would "only serve to inflame the jury."  [Doc. 188 at 4–7].  Plaintiff responds

19

A.2157

that "these theories are and always have been inextricably intertwined, especially with respect to the defamatory publications at issue here," [Doc. 205 at 3], pointing to allegations in the Second Amended Complaint that, in Plaintiff's view, combine the Dominion and China Claims, *see, e.g.*, [Doc. 170 at ¶ 63].

Because certain allegedly defamatory statements involving Dr. Coomer and election interference invoke both the Dominion and China Claims, *see* [*id.* ("The cows are out of the barn.  Dominion, you did your best, and Smartmatic, to take our country through China.  You did your best, you corrupt people, you.")], the Court declines to exclude the corresponding opinions by Dr. Halderman on the ground that prejudice would arise from admitting them.  Indeed, the challenged opinions appear relevant to a jury assessment of Defendants' reckless disregard, if any, with respect to the broader picture of potential election interference into which the alleged defamation against Dr. Coomer fits.  *See* Fed. R. Evid. 401 (relevant evidence tends to make any fact of consequence more or less probable).  This Court acknowledged as much in denying Defendants' motion to dismiss. *See* [Doc. 119 at 13 ("Plaintiff also alleges facts that would permit a factfinder to conclude that Defendants conducted no investigation into the veracity of Mr. Oltmann's assertions prior to promoting or publishing their own statements, despite obvious reasons to doubt the veracity of his claims." (quotation omitted))].  The Motion to Exclude is **DENIED** as to these opinions.

**B.    Cyber Symposium**

Next, Defendants seek to exclude opinions by Dr. Halderman that "concern his analysis of data released at the August 2021 Cyber Symposium."   [Doc. 188 at 7]. Defendants argue that "[n]othing in Halderman's analysis or opinions in any way concerns

20

A.2158

how one or more statements Defendants published about Coomer were false, were made with actual malice, or somehow caused damage to Coomer." [*Id.*].  Plaintiff responds that "[t]he Cyber Symposium is an event of central significance in this case," and that Dr. Halderman's opinions are relevant to the assessment of actual malice.  *See* [Doc. 205 at 11–12 (arguing that Dr. Halderman's opinions "demonstrate[] the inherent implausibility of the theory presented, and Defendants' willful avoidance of the truth")].  The Court agrees with Plaintiff that Dr. Halderman's opinions about the data at the Cyber Symposium may bear on the jury's assessment of whether Defendants acted with actual malice with respect to Dr. Coomer, including for the reasons discussed above.  *See, e.g.*, [Doc. 189 at ¶¶ 55–67 (opining that Cyber Symposium data was fraudulent)].  The Motion to Exclude is **DENIED** as to this issue.

### C.    Antrim County Election Results

Similarly, Defendants argue that the portion of Dr. Halderman's Declaration addressing election results in Antrim County, Michigan, is irrelevant because it "ha[s] nothing to do with Coomer."  [Doc. 188 at 7–8].  Plaintiff responds that these opinions are admissible because, among other grounds, they "serve[] to demonstrate how Defendants disregarded reliable sources and willfully avoided the truth, both of which are factors relevant to the jury's actual malice analysis."  *See* [Doc. 205 at 12]; *see also* [Doc. 189 at ¶ 99 (Dr. Halderman noting that "Oltmann and Lindell both frequently reference the publication of erroneous election-night results in Antrim County, Michigan as evidence for their conspiracy theories")].  For the reasons discussed above, the Court agrees with Plaintiff that these opinions are admissible to show actual malice.  The Motion to Exclude is **DENIED** as to Dr. Halderman's opinions regarding the Antrim County election results.

## D.    Mr. Oltmann's Statements

Defendants next take issue with a section of Dr. Halderman's Declaration rebutting certain allegedly defamatory statements made by Mr. Oltmann about Dr. Coomer. *See* [Doc. 188 at 8]. Defendants argue that these opinions cannot be admitted unless Plaintiff demonstrates that Defendants doubted the truth of Mr. Oltmann's statements. *See* [*id.*]. Plaintiff responds that "actual malice can also be shown through reckless disregard of the truth and the various factors courts have established to make that assessment," and that "Dr. Halderman's testimony on this topic speaks directly to the falsification of the lies at issue here, their reliance on anonymous sources, their inherent implausibility, the willful avoidance of the truth necessary to sustain them, and the conformity of the claims to Defendants' pre-conceived narrative." [Doc. 205 at 12–13]. With respect to the appropriate legal standard, Plaintiff is plainly correct, as the Court has discussed. *See, e.g.*, *Spacecon Specialty Contractors*, 713 F.3d at 1041 ("To meet its burden of showing actual malice, [a plaintiff] must show by clear and convincing evidence [that the defendant] published the [statement] with knowledge of its falsity or in reckless disregard of the truth."); *see also* [Doc. 119 at 11]. Accordingly, for the reasons discussed above, the contemplated testimony is relevant to assessing actual malice and the Motion to Exclude it is **DENIED**.

## E.    Dr. Coomer's Character

Defendants seek to bar Dr. Halderman from testifying that Dr. Coomer is "a man of principle who shared [his] goal of safeguarding election integrity." [Doc. 188 at 9–10 (quotation omitted)]. Defendants argue that such testimony is irrelevant or, if relevant, would constitute inadmissible character evidence under Rule 404(a)(1). [*Id.*]. That rule

22

A.2160

provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Plaintiff responds that Dr. Halderman has "personal experience and knowledge" of Dr. Coomer's character, that Defendants' argument is "puzzling" because Defendants have distanced themselves from Mr. Oltmann, and that Defendants fail to address the "particular occasion" that Dr. Halderman's testimony would relate to under Rule 404(a)(1). *See* [Doc. 205 at 13–14]. Defendants reply that "Dr. Halderman is not qualified by background as an election security expert, by his minimal personal knowledge of Plaintiff, or by the Federal Rules of Evidence to testify to Plaintiff's character." [Doc. 213 at 7]. It is difficult to assess these issues in the abstract, but it appears that the only way that Dr. Halderman's opinion about Dr. Coomer's character could be relevant to disputed issues would result in violation of Rule 404(a)(1). The Motion to Exclude is thus provisionally **GRANTED** as to Dr. Halderman's opinion about Dr. Coomer's character, subject to reconsideration at trial if Plaintiff offers the evidence for a different purpose.

### F.     The Phrase "Conspiracy Theory"

Defendants argue that the Court must exclude Dr. Halderman's opinion that Mr. Lindell's beliefs about election fraud are "conspiracy theories" because that phrase "has a pejorative connotation" that would tend to prejudge the actual-malice issue. [Doc. 188 at 9–10]. To be sure, the Court heeds Defendants' authority that expert witnesses may not opine on legal issues. *See, e.g.*, *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (expert testimony on questions of law is "not favored"). However, the opinion which Defendants seek to exclude is not actually an opinion about whether Mr. Lindell acted

23

A.2161

with actual malice as a matter of law, but merely whether Dr. Halderman, in the exercise of his unchallenged expertise on election cybersecurity, views Mr. Lindell's beliefs on the same topic as an unfounded "conspiracy theory." *See* [Doc. 188 at 9–10]. That kind of opinion may certainly play into the jury's assessment of actual malice, rendering it relevant evidence, but it does not equate to an impermissible expert conclusion that Defendants acted with actual malice—as the Honorable William J. Martínez recognized in another of Dr. Coomer's cases. *See Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1202 (D. Colo. 2023) ("Dr. Halderman's opinion that Oltmann's claims about Dr. Coomer should have been incredible 'to any responsible' party does not tell the finder of fact how to apply the law to the facts. It is simply an opinion on a fact relevant to the 'actual malice' element of a defamation claim involving a matter of public concern." (citation omitted)).

The Court agrees with Plaintiff that Defendants' "circuitous argument, taken to its logical conclusion, would suggest that Dr. Halderman cannot say anything which might suggest a connection to any of the burdens Dr. Coomer must meet to sustain his claims." [Doc. 205 at 14]. But Defendants provide no authority for such a sweeping limitation on the scope of allowable, otherwise admissible expert opinions under Rule 702. *Cf. United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013) (concern arises "when an expert uses a specialized legal term and usurps the jury's function"). To the extent that Dr. Halderman's opinions employ the phrase "conspiracy theory," such opinions are not inadmissible on the ground that they get at whether Defendants acted with actual malice. Nor does use of the phrase, which accurately reflects Dr. Halderman's opinions, appear

24

A.2162

sufficiently prejudicial to implicate Rule 403.  The Motion to Exclude is **DENIED** as to this issue.

### G.    Credibility of Evidence or Witnesses

Defendants next move to exclude opinions by Dr. Halderman that Mr. Lindell, other witnesses, or election security experts are not credible, "or that their evidence, conclusions, statements, and beliefs are implausible."  [Doc. 188 at 10].  Defendants direct the Court to authority that "an expert opining on the credibility of an individual violates Rule 702 because 'the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." *Carter v. Monger*, No. 19-cv-03555-GPG, 2022 WL 1115225, at *6 (D. Colo. Apr. 13, 2022) (quoting *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001)); *see also United States v. Hill*, 749 F.3d 1250, 1260–61 (10th Cir. 2014).  In response, Plaintiff seems to concede that testimony concerning witness credibility is not allowed under applicable law, contending only that "Dr. Halderman's testimony regarding the credibility of *evidence* is among his most relevant and helpful for the jury," and that the proper vehicle for opposing such testimony would be a rebuttal expert.  [Doc. 205 at 15 (emphasis added)].  To the extent that Plaintiff has not conceded that he will not elicit or present witness credibility opinions through Dr. Halderman at trial, the Motion to Exclude is **GRANTED** with respect to individual credibility opinions.  *See Carter*, 2022 WL 1115225, at *6.

Turning to the evidence, and noting the absence of argument in Defendants' reply brief on this point, [Doc. 213 at 5–6], the Court agrees with Plaintiff that, as a general matter and subject to any appropriate objections at trial, Dr. Halderman may offer

otherwise properly disclosed opinions that play into the jury's credibility determinations with respect to Defendants' witnesses—such as whether, within the scope of Dr. Halderman's expertise, those individuals' "evidence, conclusions, statements, and beliefs are implausible." [Doc. 188 at 10]. The Court notes that much of Defendants' argument in this regard is based on its argument about the phrase "conspiracy theories," *see* [*id.* (arguing that Dr. Halderman's implausibility opinions are "essentially opining as to the legal issue of actual malice")], which the Court has rejected for the reasons discussed above. Without prejudging any more particularized trial objections by Defendants, the Motion to Exclude is **DENIED** with respect to such opinions.

### H.   Mr. Lindell's State of Mind

Arguing that Dr. Halderman is "[a]cting more as an advocate than an expert witness," Defendants last move to exclude opinions that "speculate[] as to Lindell's state of mind." [Doc. 188 at 11]. Defendants specifically point to potential testimony (1) "that Mr. Lindell's alleged defamatory speech is motivated by a desire 'to promote his own political and business interests regardless of the truth,'" [*id.* (quoting [Doc. 189 at ¶ 10])]; (2) that Mr. Lindell selected cybersecurity experts "based upon whether they would tell him what he wanted to hear," [*id.*]; and (3) that Mr. Lindell's statements were a "hoax," which "is nothing more than an opinion on Lindell's state of mind" because a hoax entails an intention to deceive, [*id.*]. Plaintiff responds that these opinions "all derive from Dr. Halderman's personal experience and knowledge arising from his review of Defendants' claims and the bases upon which they rely," and that they are relevant to assessing actual malice. [Doc. 205 at 15]. Defendants do not dispute that Mr. Lindell's state of mind is relevant to the actual-malice inquiry. [Doc. 213 at 5].

A.2164

Respectfully, the Court largely agrees with Defendants.  Although Plaintiff contends that the opinions at issue come from Dr. Halderman's personal experience, Plaintiff provides no support in the record for this assertion, *see* [Doc. 205], nor would such testimony seem to be the province of an expert on cybersecurity or elections under Rule 702, *see Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, No. 15-cv-01541-CMA-MLC, 2018 WL 571877, at *3 (D. Colo. Jan. 26, 2018) ("[T]o the extent [the expert witness] begins to improperly speculate about . . . motivations, intent, or state of mind, . . . such speculation is not contemplated by Rule 702 and should be excluded.").  Defendants are therefore correct that Dr. Halderman "is entitled to his beliefs about Lindell or his motives," but that it would be "improper to allow him to express those beliefs to the jury under the veneer of expertise."  [Doc. 213 at 5].  Unless a proper foundation can be laid at trial with respect to personal knowledge, Dr. Halderman may not speculate as to Mr. Lindell's motivations for publishing the allegedly defamatory speech or hiring certain cybersecurity experts, and the Motion to Exclude is **GRANTED** with respect to those opinions.  Of course, while Dr. Halderman may not directly testify to these matters, the jury may still rely upon his testimony to reach inferences about Mr. Lindell's state of mind.  *Cf. Turnkey Sols. Corp.*, 2018 WL 571877, at *3 (noting that an expert witness may properly testify as to "facts and . . . observations from which the jury can then infer motive or intent").

However, the Court disagrees that Dr. Halderman's opinion that certain statements by Mr. Lindell constitute a "hoax" is somehow equivalent to an opinion on Mr. Lindell's state of mind and inadmissible on that basis.  *See id.*  The Motion to Exclude is **DENIED** as to such opinions.

27

A.2165

### III.    Motion to Strike

In his Motion to Strike, Plaintiff seeks to strike Defendants' designation of certain nonparties as bearing responsibility for any harm suffered by Plaintiff.  [Doc. 216].  As to comparative fault, Colorado law provides the following:

> In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss.

Colo. Rev. Stat. § 13-21-111.5(1).  With respect to designating at-fault nonparties:

> Negligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action unless the court determines that a longer period is necessary.  The notice shall be given by filing a pleading in the action designating such nonparty and setting forth such nonparty's name and last-known address, or the best identification of such nonparty which is possible under the circumstances, together with a brief statement of the basis for believing such nonparty to be at fault.

*Id.* § 13-21-111.5(3)(b).  "The statute's terms plainly assume the existence of at least two wrongdoers whose acts or omissions combine to produce a loss."  *Hughes v. Johnson*, 764 F. Supp. 1412, 1413 (D. Colo. 1991).

On October 5, 2023, Defendants filed their Designation of Nonparties at Fault ("Defendants' Designation") pursuant to Colo. Rev. Stat. § 13-21-111.5.  [Doc. 199]. Defendants' Designation identifies twenty-three nonparties that, according to Defendants, should have their comparative liability for Plaintiff's injuries (if any) assessed by a jury in a manner that discounts Defendants' liability (if any).  With one exception, the designated nonparties are individuals or entities named as defendants in other defamation actions

28

A.2166

filed by Dr. Coomer, several of whom have settled with Dr. Coomer.[4]  The basic theory of Defendants' Designation is that the designated nonparties spread the same allegedly defamatory story about Plaintiff that originated with Mr. Oltmann and that Defendants have been sued in this action for publishing, which renders them "liable for causing the same alleged damage" as Defendants.  *See, e.g.*, [*id.* at 6].[5]

Plaintiff has now moved to strike Defendants' Designation.[6]  [Doc. 216].  Plaintiff first argues that Defendants' Designation is untimely because the statute requires that notice be made "within ninety days following commencement of the action unless the court determines that a longer period is necessary."  Colo. Rev. Stat. § 13-21-111.5(3)(b). Plaintiff notes that this civil action was filed in Colorado state court on April 4, 2022, and removed to federal court on May 5, 2022, rendering Defendants' Designation over a year late.  *See* [Doc. 216 at 2].  Defendants respond that they filed within ninety days of

---

[4] The designated nonparties are Newsmax Media, Inc.; Herring Networks, Inc. d/b/a One America News Network; Chanel Rion; Joseph Oltmann; Sidney Powell; Sidney Powell, P.C.; Defending the Republic, Inc.; Rudolph Giuliani; Donald J. Trump for President Inc.; FEC United; Shuffling Madness Media, Inc. d/b/a Conservative Daily; James Hoft; Michelle Malkin; Eric Metaxas; TGP Communications LLC d/b/a The Gateway Pundit; Randy Corporon; Salem Media of Colorado, Inc.; Make Your Life Epic LLC d/b/a Thrivetime Show; Clayton Thomas Clark; David K. Clements; Patrick Byrne; Steven Lucescu; and The America Project, Inc.  *See* [Doc. 199].

[5] The sole designated nonparty that was not named in another defamation action filed by Plaintiff is David Clements who, according to the Second Amended Complaint, published the same theory originating with Mr. Oltmann at issue in Plaintiff's defamation cases.  *See* [Doc. 170 at ¶¶ 83, 85–89].  Accordingly, the Court treats all designated nonparties together.

[6] Defendants contend that the Motion to Strike should itself be stricken or denied due to Plaintiff's failure to comply with this Court's conferral requirements.  In its discretion, and in view of the issues raised in the Motion to Strike, the Court will excuse this procedural defect but specifically advises Plaintiff that failure to confer is sufficient grounds for the Court to deny a motion without substantive review.  *See, e.g.*, *Crocs, Inc. v. Effervescent, Inc.*, No. 06-cv-00605-PAB-KMT, 2017 WL 4368158, at *2 (D. Colo. Sept. 30, 2017).

A.2167

Plaintiff's Second Amended Complaint, which was the first pleading which they were required to answer. *See* [Doc. 224 at 4–8]. Alternatively, Defendants contend that good cause exists for extending the deadline, and that the deadline does not apply as to the designated nonparties with whom Plaintiff has settled. *See* [*id.* at 8–15].

Even assuming that the designations were timely, or that good cause supported any delay, this Court respectfully concludes that Defendants' Designation should be stricken. On the merits, Plaintiff argues that the designated nonparties have not "played any role in *the defamatory publications at issue in this dispute*." [Doc. 216 at 3–4 (emphasis added)]; *see also* [*id.* at 4 ("Defendants cannot designate nonparties at fault for publishing specific statements when they indisputably have no potential relation to those publications.")]. Plaintiff further contends that "designation of nonparties at fault is not the proper means of addressing the concern that Defendants attempt to raise," which is, in Plaintiff's view, causation. [*Id.*]. As Plaintiff puts it, "a defense that the defendant did not cause the plaintiff's injuries is not equivalent to the designation of a nonparty because it cannot result in apportionment of liability." [*Id.*]. Defendants respond that their Designations "set[] forth a meritorious defense of comparative fault" as to all designated nonparties that "defamed [Plaintiff] by publishing, dissemination, and/or amplifying" the same connection between Dr. Coomer and election interference that is at issue in this litigation, necessarily causing him "the same damage." [Doc. 224 at 10]. Defendants further argue that the question is not whether they "committed the same tort" as the designated nonparties, [*id.* at 12 n.9 (citing *Moody v. A.G. Edwards & Sons, Inc.*, 847 P.2d 215, 217 (Colo. App. 1992))], but that, even if it were, Dr. Coomer's cases "all revolve around alleged publications which are the same or similar in substance," [*id.*].

30

A.2168

The Court has found no authority, in Defendants' briefing or elsewhere, for the proposition that the designation of nonparties at fault applies in the context of a defamation action where the nonparties are alleged to have separately defamed the plaintiff by publishing similar or identical statements. *See generally* [*id.*]. Such an approach to comparative liability would seem to contradict the basic theory of designating a nonparty at fault under Colorado—that it contributed to the <u>same injury</u> as the named defendant. *See Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) ("[A] non-party designation is reserved for individuals or entities who might themselves be at fault and therefore liable for *the injury at issue*." (emphasis added)); *Miller v. Byrne*, 916 P.2d 566, 577 (Colo. App. 1995) ("[A] defendant has a right to seek contribution from a joint tortfeasor for the amount the defendant pays in excess of his or her pro rata share of liability for the *same injury rendered* to the plaintiff." (emphasis added)); *Blakeland Drive Invs., LLP IV v. Taghavi*, 532 P.3d 369, 380 (Colo. App. 2023) ([T]he statute applies to both intentional and negligent acts that cause indivisible injuries."). The fact that a party and a nonparty defamed Plaintiff in the same way, allegedly causing or contributing to similar harm around the same time, does not mean that the nonparty is "at fault" for the party's statements within the contemplation of Colorado law. Each has effected a different, albeit similar, injury. Indeed, Defendants' Designation fails to describe how the conduct of the identified nonparties contributed to *Defendants'* alleged defamation. *See* [Doc. 199].

The closest case the Court has reviewed involves a sexual assault claim against a celebrity who designated various tabloids and websites as nonparties at fault because they allegedly contributed to the victim's reputational damages by defaming her online

A.2169

and in print.    The Court is persuaded by the reasoning of the Honorable Richard P.

Matsch, who explained his decision to strike those designations in open court as follows:

> [G]iven the allegations in the pleadings and what is shown in these publications, in my view, these various publishers, known and unknown, cannot be considered non-parties at fault in this case.  What they show is that the allegations that are now here in the civil case were first made in a criminal context, and that the criminal proceedings generated a great deal of comment from a number of sources.  *And, that may be relevant to this trial in terms of causation of injuries asserted to have been sustained by the defendant—as a result of the defendant's conduct.*  And, we will be, I'm sure, dealing with questions of intervening cause, foreseeability, those ordinary concepts of causation that we have in tort law in Colorado.  But, that is not—does not invoke the apportionment requirements of the statute.  You need only imagine what a jury verdict would look like in this case . . . to see that the concept doesn't fit.

*Faber v. Bryant*, Civil Action No. 04-cv-01638-RPM, [ECF No. 40 at 5:19–6:11] (D. Colo.

Feb. 10, 2005) (emphasis added).  This Court agrees with Judge Matsch.  Just like in

*Faber*, Defendants' contention is that the designated nonparties injured Plaintiff based on

factually related conduct—not that the designated nonparties had any hand in the injuries

perpetrated by the named Defendants that are at issue in the litigation.

Nor is it clear that Colorado's statute even applies to the kinds of nonphysical

harms for which Plaintiff seeks to recover damages.  *See, e.g.*, *Broderick v. McElroy &*

*McCoy, Inc.*, 961 P.2d 504, 507 (Colo. App. 1997) (noting that "§ 13-21-111.5(1) . . . limits

the scope of § 13-21-111.5 . . . concerning pro rata liability of defendants to those actions

'brought as a result of a death or an injury to person or property'").  Indeed, the Uniform

Comparative Fault Act expressly confines the doctrine of comparative fault's application

to physical harm to persons or property, excluding "matters like economic loss resulting

from a tort such as negligent misrepresentation, or interference with contractual relations

or *harm to reputation resulting from defamation.*"  *Vaught v. Pequot Props., LLC*, No.

554980, 2001 WL 717446, at *2 (Conn. Super. Ct. June 1, 2001) (emphasis added)

A.2170

(quoting Uniform Comparative Fault Act § 1, cmt.).[7]  As noted, Defendants have provided no authority for the application of Colorado's statute to a case involving multiple defamers.

To be sure, Defendants are correct that Colorado courts have held that "the acts on the part of a designated nonparty which have contributed to a plaintiff's injury are not required to have been the *same* tortious acts as those of a defendant."  *See Moody*, 847 P.2d at 217 (emphasis in original).  And "a jury need not consider whether the respective act or acts of the tortfeasors were undertaken in conjunction with a defendant's tortious act or acts so long as all of the acts, considered together, were instrumental in contributing to a plaintiff's injury."  *Id.* at 217–18.  But the Court finds that these authorities map poorly onto the separate, overlapping injuries allegedly produced by the defamation of Plaintiff.  Colorado law is clear that "liability may only be apportioned between a defendant and a designated nonparty when admissible evidence has been presented that the nonparty contributed to the plaintiff's injury," *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536 (Colo. 1997), but the cases tend to involve fact patterns where the designated nonparty contributed to the <u>same injury</u>, *see, e.g.*, *id.* at 534 (company that rented electric sewer auger to plaintiff designated the manufacturer in lawsuit arising out of accident).  To the extent that Plaintiff has been actionably injured by the defamation of Defendants and

---

[7] "The Uniform Comparative Fault Act and the Uniform Contribution Among Tortfeasors Act are not actual statutes but instead are freestanding collections of uniform laws for individual states to adopt." *Bank One, N.A. v. C.V.Y. Corp.*, No. 01-cv-01807-MSK-MJW, 2008 WL 501412, at *4 n.8 (D. Colo. Feb.21, 2008).  Nonetheless, the Court finds the background principles set forth in the cited comment to the Uniform Comparative Fault Act to be relevant to the interpretation of Colorado law in this case.  *See, e.g.*, *Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470, 1477 (10th Cir. 1990) (referencing Colorado General Assembly's awareness of Uniform Comparative Fault Act and other jurisdictions' comparative fault regimes); *City & Cnty. of Denver v. Adolph Coors Co.*, 829 F. Supp. 340, 344 (D. Colo. 1993) (accounting for "independent backdrop[]" provided by the Uniform Comparative Fault Act and the Uniform Contribution Among Tortfeasors Act).

33

A.2171

nonparties alike, that is a matter of apportioning damages and untangling causation firmly within the jury's province at trial, not the stuff of comparative fault designations under § 13-21-111.5.

The Court concludes that Defendants have not met their burden to demonstrate that any of the individuals or entities named in Defendants' Designation are liable to Plaintiff for the injuries allegedly caused by Defendants' conduct. *See Roe v. Hous. Auth. of City of Boulder*, 909 F. Supp. 814, 823 (D. Colo. 1995) (declining to apply Colorado's comparative fault statute, where party invoking it failed to cite any authority applying the statute to the claims at issue). "[B]ecause Appellants did not make a coherent, developed argument for applying § 13-21-111.5 here, the Court declines to do so." *Cowen v. WD Equip., LLC*, No. 21-cv-03133-GPG, 2023 WL 8818119, at *13 (D. Colo. Nov. 8, 2023); *see also Redden*, 38 P.3d at 80 ("Courts should construe designation requirements strictly to avoid a defendant attributing liability to a non-party from whom the plaintiff cannot recover."). The Motion to Strike is respectfully **GRANTED** and Defendants' Designation is hereby **STRICKEN**. However, as Plaintiff acknowledges, and as discussed in the context of the Motion for Summary Judgment's arguments about causation and actual damages, "the concern that Defendants attempt to raise" still has a place in this action. *See* [Doc. 216 at 4]. Plaintiff must prove that his claimed damages are attributable to these Defendants, and Defendants may contend at trial that Plaintiff's injuries were caused in whole or in part by the conduct of others.

A.2172

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1)    Defendants' Omnibus Motion for Summary Judgment [Doc. 177] is **DENIED**;

(2)    Defendants' Motion to Exclude Testimony of J. Alex Halderman [Doc. 188] is **GRANTED in part** and **DENIED in part**;

(3)    Plaintiff's Objec[t]ion to Defendants['] Designation of Nonparties at Fault and Motion to Strike Designation [Doc. 216] is **GRANTED**; and

(4)    Defendants' Designation of Nonparties at Fault [Doc. 199] is **STRICKEN**.

DATED:  August 29, 2024

BY THE COURT:

_____
Nina Y. Wang
United States District Judge

35

A.2173

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER, Ph.D.,

    Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

    Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

This matter was tried on June 2, 2025, through June 6, 2025, and June 9, 2025, through June 13, 2025, and June 16, 2025, before a duly sworn jury of eight, United States District Judge Nina Y. Wang presiding. The trial proceeded to conclusion and the jury rendered its Verdict Forms.

Accordingly, it is **ORDERED** that final judgment is hereby entered in favor of Plaintiff, Eric Coomer, and against Defendant Michael J. Lindell as to Count One, and in favor of Defendant Michael J. Lindell and against Eric Coomer as to Counts Two and Three. It is

**FURTHER ORDERED** that judgement shall enter in favor of Plaintiff Eric Coomer, and against Defendant Frankspeech LLC as to Counts One and Two and with

A.3011

respect to exemplary damages, and in favor of Defendant Frankspeech LLC, and against Plaintiff Eric Coomer as to Count Three.  It is

FURTHER ORDERED that judgment shall enter in favor of Defendant My Pillow, Inc., and against the Plaintiff Eric Coomer as to Counts One, Two, and Three.  It is

FURTHER ORDERED that pre-judgment interest shall accrue on all compensatory damages at the rate of 9%, as set forth in Colo. Rev. Stat. § 13-21-101, from the date the action accrued.  It is

FURTHER ORDERED that post-judgment interest shall accrue at the current rate of 4.10%, as calculated pursuant to 28 U.S.C. § 1961, from the date of entry of judgment.  It is

FURTHER ORDERED that Plaintiff Eric Coomer, shall have his costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen days of the entry of judgment, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED at Denver, Colorado this 24th day of June 2025.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/ H.Guerra
     Deputy Clerk

A.3012

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 22-cv-01129-NYW-SBP

ERIC COOMER,

      Plaintiff,

v.

MICHAEL J. LINDELL,
FRANKSPEECH LLC, and
MY PILLOW, INC.,

      Defendant.

---

## ORDER ON POST-TRIAL MOTIONS

---

This matter is before the Court on (1) Defendants Michael J. Lindell's and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law ("Motion for JMOL"), [Doc. 386]; and (2) Plaintiff's Motion to Amend Final Judgment (together, "Motions"), [Doc. 387]. Upon review, the Court concludes that oral argument would not materially assist in the resolution of the Motions. For the reasons set forth below, the Motions are respectfully **DENIED**.

### BACKGROUND

The Court has previously discussed the background of this case, *see* [Doc. 119 at 1–5; Doc. 197 at 3–7; Doc. 261 at 2–3], and repeats it only to the extent necessary to decide the pending Motions. In brief, Plaintiff Eric Coomer ("Plaintiff" or "Dr. Coomer") sued Defendants Michael J. Lindell ("Mr. Lindell"), Frankspeech LLC ("Frankspeech"), and My Pillow, Inc. ("MyPillow") for their claims that Dr. Coomer, a former employee of Dominion Voting Systems, Inc., participated in efforts to interfere with the 2020

A.5011

presidential election. [Doc. 170 at ¶ 29]. Plaintiff alleged that Defendants published false and defamatory statements—which originated from nonparty Joseph Oltmann ("Mr. Oltmann")—that Plaintiff told an "Antifa conference call" that he had "made . . . sure" that President Donald J. Trump would not win the 2020 presidential election. [*Id.*].

Plaintiff proceeded to trial on three claims: (1) defamation, (2) intentional infliction of emotional distress ("IIED"), and (3) civil conspiracy. [*Id.* at ¶¶ 146–59]; *see, e.g.*, [Doc. 375 (verdict form as to Mr. Lindell)]. The jury found Mr. Lindell liable for defamation as to two statements and found him not liable for IIED or civil conspiracy. [Doc. 375]. The jury found Frankspeech liable for defamation as to three statements, liable for IIED, and not liable for civil conspiracy. [Doc. 377]. The jury also awarded punitive damages against Frankspeech. [*Id.* at 3]. The jury found MyPillow not liable on all three claims. [Doc. 379].

The jury found both Mr. Lindell and Frankspeech liable for defamation as to the following statements:

- A statement by Mr. Lindell during a May 9, 2021, interview that aired on Frankspeech:

  It's over for Dominion, it's too late to close the gate. The cows are out of the barn. Dominion, you did your best, and Smartmatic, to take our country through China. You did your best, you corrupt people, you. You tried to suppress our voice. You did it, but you failed. And I'm telling you, you Coomers of the world. What's his name? Yeah, Eric Coomer, if I'm you right now, I am, instead of going over and making deals at Newsmax, if I'm you, I'm turning myself in and turning in the whole operation so maybe, just maybe, that you get immunity and you only get to do, I don't know, ten, twenty years. I mean, you are disgusting, and you are treasonous. You are a traitor to the United States of America. And you know what? I can say that, just like I can about Brian Kemp and Brad Raffensberger. These are things that I have evidence of. The evidence is there. You know, it's sitting there. Well Mike, 'Why don't you turn it all in to the Supreme Court and bring it to the FBI?' Oh, it's getting to the Supreme Court, everybody. But

2

A.5012

we're going to let you the people, that's what Frank's all about, we're going to dump it.  We're not taking any chance that those nine justices, 'Nope, we don't want to look at it, because they told us in early November there was not enough to overturn the election.  And we don't want to get involved you know, because somebody might get upset.'  Well you know what?  This wasn't around in November December.  This came on January 9.

[Doc. 371 at 12–13 ¶ 28].

- Another statement by Mr. Lindell during an April 6, 2022, interview that aired on Frankspeech:

So everybody, if you want to know just how corrupt, the corruption we're up against.  Eric Coomer served, had served papers to me before I was going onstage at the Capitol.  I've never talked about Eric Coomer.  He's the, apparently he's the president of Dominion, the criminal crime family here in Denver. . . .  Who knows what he did there, but anyway, he served papers, everybody.  He has sued, everybody ready for this?  Mike Lindell, Frank Speech, and My Pillow.  Eric Coomer, you are a criminal.  Eric Coomer, your lawyers better look out.  I'm not putting up with this.  My Pillow doesn't even know who you are.  My employees, I have 2,700 employees.  Shame on you Eric Coomer.  You did a very, very stupid move, Mr. Coomer.  You're going to be the first one, right behind Raffensperger and Jena Griswold behind bars.  You're #1 on my list.  You go after my employees, go after my company again, you're disgusting. . . .  You've been a part of the biggest crime this world has ever seen.  Eric Coomer, president of Dominion, you have even said what you did or what you were going to do.  You're disgusting.  You're disgusting, you're evil, you belong behind bars, and we will not stop until you are behind bars.  We're going to melt down your little machines and you're going to hang on to your little prison bars.  "Let me out, let me out!"  Should have thought about that, Eric Coomer, before you did crimes against the United States and quite frankly all of humanity.  It's disgusting what you've done.  You and Dominion.  And Jena Griswold."

[*Id.* at 15–16 ¶ 40].

The jury also found Frankspeech liable for defamation for a statement by non-party

David Clements on August 12, 2021:

Alright, so you've got a couple of hitmen that were pulling the triggers.  The first gentleman, if you know, is John Poulos, who is the CEO of Dominion.  When he gave those remarks, it was before the legislature, under oath.  John Poulos committed perjury, time and time again.  The other gentleman at the end was a person we've heard about because of Joe Oltmann.  Eric Coomer, who holds the patent for the feature known as adjudication, which is one of

3

A.5013

the tools in their tool chest to murder the American people's vote.  And this is one of the statements he made along with, when Joe Oltmann talked about being on the call, this is what he heard.  And you heard from Joe Oltmann.  You can assess whether you think he's telling the truth.  'I made f-ing sure that Trump's not going to win.'  That's the vice president of a company that's running elections in 28 states.  You've got your election cartel, you've got your vote trafficking organizations, and you have the man that pulled the trigger.

[*Id.* at 15 ¶ 36].  Mr. Clements made this statement during Mr. Lindell's Cyber Symposium, which was livestreamed by Frankspeech.  [*Id.* at 14 ¶ 34, 15 ¶ 36].

During trial, at the close of evidence, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  In relevant part, they argued that (1) Frankspeech is immune from liability under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230; (2) that Plaintiff could not prove economic damages; and (3) that Plaintiff could not prevail on his defamation claims because he had failed to prove actual malice as to any Defendant.  [Doc. 399 at 1751:17–1754:1].  The Court denied the motion.  [*Id.* at 1776:20–1791:19].

Pursuant to Rule 50(b), Mr. Lindell and Frankspeech (together, "Defendants") now renew their motion for judgment as a matter of law.  [Doc. 386].  Plaintiff has responded.  [Doc. 392].  Plaintiff also seeks to amend the final judgment to increase the punitive damages award against Frankspeech pursuant to Rule 59 and Colo. Rev. Stat. § 13-21-102(3).  [Doc. 387]; Fed. R. Civ. P. 59.  Frankspeech has responded, [Doc. 404], and neither Party has sought leave to file a reply in support of its respective motion.  The Motions are therefore ripe for disposition.

4

A.5014

## LEGAL STANDARDS

**I.    Rule 50(b)**

Under Rule 50(a), a court may grant judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).  If the court denied a party's Rule 50(a) motion, Rule 50(b) permits a party to renew its motion for judgment as a matter of law after the jury has returned a verdict.  Fed. R. Civ. P. 50(b).  Courts apply the same standard of review to motions under Rule 50(a) and Rule 50(b).  *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1287 (10th Cir. 2006).

In deciding a motion for judgment as a matter of law, the Court considers all the evidence presented at trial and reviews the record "taken as a whole." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (quotation omitted).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).  "Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable [jurors] could not arrive at a contrary verdict." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (quotation omitted); *see also Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) ("Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to

5

A.5015

no reasonable inferences which may support the nonmoving party's position.") (quotation omitted).

## II.     Rule 59

Rule 59 permits a party to file a "motion to alter or amend a judgment."  Fed. R. Civ. P. 59(e).  Motions under Rule 59(e) are appropriate in only a limited number of circumstances.  "Grounds warranting a motion to alter or amend the judgment pursuant to Rule 59(e) 'include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.'"  *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1203 (10th Cir. 2018) (quoting *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).  Rule 59(e) motions are not an appropriate vehicle "to revisit issues already addressed or advance arguments that could have been raised in prior briefing," *id.* (quotation omitted), or "to raise arguments or present evidence that could have been raised prior to the entry of judgment," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quotation omitted).  "[I]n determining whether to grant or deny a Rule 59(e) motion to alter or amend the judgment, the district court is vested with considerable discretion."  *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996).

## ANALYSIS

## I.     Defendants' Motion for JMOL

Defendants seek judgment as a matter of law on four grounds.  First, they ask the Court to find Frankspeech immune from suit under § 230 of the CDA.  [Doc. 386 at 2–5].  Second, they ask the Court to set aside the jury's economic damages award.  [*Id.* at 5–6].  Third, they argue that Mr. Lindell cannot be held liable for defamation based on the

6

A.5016

jury's verdict.  [*Id.* at 7–9].  Fourth, they contend that Frankspeech cannot be held liable for defamation based on Mr. Lindell's or Mr. Clements's statements.  [*Id.* at 9–11].

As an initial matter, the Court notes that all of these arguments were adequately preserved in Defendants' initial Rule 50(a) motion.  Plaintiff does not dispute this point. *See* [Doc. 392].  The Court will address each argument in turn.

## A.    Section 230 of the CDA

Defendants contend that § 230 of the CDA immunizes Frankspeech from liability for the three statements the jury found to be defamatory.  [Doc. 387 at 2–5].  It is entirely unclear why Defendants waited until now to raise this issue.  Although Defendants pleaded the defense in their Answer, [Doc. 171 at 58 ¶ 5], they did not raise the issue in any pretrial motion or otherwise request a ruling on the issue at any point until the close of evidence.  The Fourth Circuit has observed that § 230 immunity should be resolved "at the earliest possible stage of the case," both to ensure that a defendant receives the full benefit of its immunity and to avoid the waste of "costly and protracted legal battles." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 255 (4th Cir. 2009) (quotation omitted).  Nevertheless, Plaintiff addresses this issue on its merits, [Doc. 392 at ¶¶ 9–17], and the Court will do the same.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  This provision "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party."  *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000).  "The prototypical service qualifying

A.5017

for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009). The Tenth Circuit has discerned three limits on the immunity provided by § 230. *Id.* Under this framework, a defendant is immunized under § 230 if "(1) it is a provider of an interactive computer service, (2) alleged liability is based on the defendant having acted as a 'publisher or speaker,' and (3) information is provided by another 'information content provider.'" *Roland v. Letgo, Inc.*, 644 F. Supp. 3d 907, 914 (D. Colo. 2022) (quoting *Accusearch*, 570 F.3d at 1196), *aff'd*, No. 22-1456, 2024 WL 372218 (10th Cir. 2024).

The Parties do not dispute whether Frankspeech meets the first two requirements—that is, that Frankspeech is an interactive computer service provider and faces liability for its actions as an alleged publisher. Accordingly, the Court focuses its analysis on the third requirement for section 230 immunity: whether the information at issue was provided by another information content provider.

Because § 230 provides immunity only for information provided by another content provider, a service provider cannot assert immunity if it is also a content provider for the information at issue. *Accusearch*, 570 F.3d 1197. The CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "This is a broad definition," and "there may be several information content providers with respect to a single item of information (each being 'responsible' at least 'in part' for its 'creation or development')." *Accusearch*, 570 F.3d at 1197 (quotation omitted).

8

A.5018

In short, the critical question for the third requirement of § 230 immunity is whether Frankspeech was "responsible for the development of the specific content that was the source of the alleged liability." *Id.* at 1198. In *Accusearch*, the Tenth Circuit explained that "development" of content involves making the content "visible," "active," or "usable," or making content "actually available or usable (something previously only potentially available or usable)." *Id.* And "a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content." *Id.* at 1199. Put differently, "to be 'responsible' for the development of offensive content, one must be more than a neutral conduit for that content." *Id.*

Without pointing to any specific trial testimony or evidence, Defendants make the conclusory argument that Frankspeech is "like YouTube or X" in that it "published information that other content providers developed and created" rather than "generat[ing] its own content." [Doc. 386 at 3]. To start, the Court has no obligation to comb the record for specific testimony supporting Defendants' characterization of the evidence. *See Adams v. Dyer*, 223 F. App'x 757, 762 n.4 (10th Cir. 2007) ("It is not the job of this court to search the record . . . for evidence."). Regardless, Plaintiff presented sufficient evidence to permit the jury to conclude that Frankspeech, through its agents, was responsible for the development of the statements at issue. *Accusearch*, 570 F.3d at 1198.

First, Defendants argue that Frankspeech cannot be liable for Mr. Lindell's statements on May 9, 2021, and April 6, 2022. Both of these statements occurred during interviews that "aired" on Frankspeech. [Doc. 371 at 12–13 ¶ 28, 15–16 ¶ 40]. Brannon

9

A.5019

Howse, the interviewer for both statements, testified that the May 9 statement occurred during a "general FrankSpeech broadcast." [Doc. 392-1 at 163:16–25]. The April 6 statement occurred on a broadcast called "The Lindell Report." [Doc. 371 at 15–16 ¶ 40]. Defendants contend that Frankspeech did not "control[]" the content on Mr. Howse's show and argue—without evidentiary support—that Mr. Howse "developed, edited, and created" the April 6, 2022, episode of "The Lindell Report." [Doc. 386 at 4].

Defendants ignore, however, that both of these statements were made by Mr. Lindell. As a corporate entity, Frankspeech "can only act through its agents, and their acts within the scope of their authority are the acts of [Frankspeech]." *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) (quotation omitted). An agent has actual authority—which may be either express or implied—when the agent "subjectively hold[s] the belief that he possesses authority, and that belief must be objectively reasonable in light of the principal's actions." *Fresquez v. Trinidad Inn, Inc.*, 521 P.3d 399, 405 (Colo. App. 2022) (cleaned up). Here, Mr. Lindell founded Frankspeech. [Doc. 371 at 10 ¶ 7]. He regularly acted as its corporate representative, including at trial. He hosted his own show on Frankspeech, broadcasted it through Frankspeech, and used the Frankspeech platform to make and publish statements about Dr. Coomer. There is no evidence that anyone other than Mr. Lindell exercised any meaningful degree of control over the Frankspeech entity. By all accounts, Frankspeech was Mr. Lindell's corporate alter ego in this context. Based on this evidence, a reasonable jury could conclude that Mr. Lindell's statements on Frankspeech broadcasts were within the scope of his actual authority as

10

A.5020

an agent of Frankspeech.[1]  Under agency law, that would mean Mr. Lindell's statements were Frankspeech's statements.  And for § 230 purposes, Frankspeech's defamatory statements through its agent would plainly qualify as participation in the development of those statements.  *Cf. Accusearch*, 570 F.3d at 1199 (observing that the "clear purpose" of the CDA is to protect internet service providers from liability "when *independent persons* negligently or intentionally use those services to supply harmful content" (emphasis added)).

Second, the Court turns to the statement by David Clements during the Cyber Symposium on August 12, 2021.  *See* [Doc. 371 at 15 ¶ 36].  A reasonable jury could also conclude that the individuals responsible for the development of this statement were agents of Frankspeech.  While Frankspeech may have operated "like YouTube" in some respects, it was not merely a neutral conduit for the content at the Cyber Symposium. Frankspeech—through Mr. Lindell and others—sponsored, promoted, and broadcasted the event.  Mr. Howse testified that the symposium was "promoted as a FrankSpeech affiliated event" and intended to, among other things, "educate the public."  [Doc. 392-1 at 244:12–15, 245:3–4].  Mr. Lindell promoted the event as a joint effort between himself, My Pillow, and Frankspeech.  [Doc. 392-4].  Frankspeech was depicted prominently alongside Mr. Lindell on the event's marketing materials, [Doc. 392-2], and Mr. Lindell used Frankspeech to offer a sale on My Pillow products that would "help support this Cyber Symposium event," [Doc. 392-4 at 3].  In addition to livestreaming the event, [Doc.

---

[1] The Court agrees with Defendants that § 230 generally presents a question of law, [Doc. 386 at 2], but "[w]hether an agent has been given authority to act on behalf of a principal is an issue of fact," *Citywide Banks v. Armijo*, 313 P.3d 647, 653 (Colo. App. 2011).  Courts can resolve agency issues as a matter of law only when "the facts are undisputed." *Fresquez*, 521 P.3d at 404 (quotation omitted).  The facts here are far from undisputed.

11

A.5021

371 at 14 ¶ 34], Frankspeech displayed its logo on an on-stage backdrop at the event, [Doc. 392-3]. Dr. Coomer and Matt Crane, another of Plaintiff's witnesses, testified that they believed Frankspeech, like the other Defendants, was responsible for the relevant statements about Dr. Coomer that occurred on Frankspeech broadcasts.[2] *See, e.g.,* [Doc. 394 at 396:3–21 (Mr. Crane testifying that the relevant statements about Dr. Coomer may cause people "who will listen to Frankspeech" to "put pressure on" elections administrators); *id.* at 468:24–469:2 ("Q. Is it your understanding that Mr. Lindell and Frankspeech gave a platform to Tina Peters and Joe Oltmann? [Mr. Crane:] And others."); *id.* at 296:15–18 ("Q. You don't know whether Frankspeech agreed with My Pillow or agreed with Mr. Lindell to do anything to you, do you? [Dr. Coomer:] I would disagree with that.")].

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Frankspeech's conduct (including its conduct through Mr. Lindell) created actual or apparent authority for Mr. Clements and other presenters at the Cyber Symposium to act as agents of Frankspeech. *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 656 (Colo. 2017) (explaining that apparent authority exists when a third party "reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal"). And because Mr. Clements was indisputably responsible for the development of his defamatory statement at the Cyber Symposium, Frankspeech is not entitled to immunity.

---

[2] The Court does not use "responsible" in a legal sense; rather, testimony that third parties attributed statements on Frankspeech broadcasts to both Mr. Lindell and Frankspeech is evidence that a reasonable jury could consider in its agency analysis.

A.5022

The Court is respectfully unpersuaded by Defendants' remaining arguments. First, to be sure, Mr. Lindell leveraged multiple entities within his control when organizing the Cyber Symposium, such as Frankspeech, My Pillow, and Lindell Management, LLC. *See* [Doc. 386 at 4; Doc. 392-4]; *cf.* [Doc. 392-1 at 318:8–319:5 (Mr. Howse testifying about a My Pillow employee who also worked with Frankspeech and Lindell Management)]. But the involvement of other entities does not entitle Frankspeech to immunity under § 230. Defendants' reference to other entities and individuals misses the point that multiple content providers may be responsible in part for the development of a single statement. *Accusearch*, 570 F.3d at 1197; [Doc. 386 at 4–5]. Next, Defendants belatedly attempt to create a fact issue over whether Frankspeech actually streamed Mr. Clements's statement. [Doc. 386 at 4–5]. This contradicts the Parties' stipulation that the Cyber Symposium was livestreamed on Frankspeech. [Doc. 371 at 14 ¶ 34]. The Court will hold Defendants to their stipulation. *See Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978) ("As a general rule, a stipulation is a judicial admission binding on the parties making it, absent special considerations."). Third, Defendants argue that the evidence does not show that "Frankspeech developed, created, or had any editorial control over the Cyber Symposium, let alone Mr. Clements' statements at this event." [Doc. 386 at 4]. Again, however, Frankspeech can only act through its agents, *Dallas Creek*, 933 P.2d at 41, and statements by its agents within the scope of their authority cannot be attributed to third parties for § 230 purposes. As explained, a reasonable jury could conclude that Mr. Clements was an agent of Frankspeech when speaking at Mr. Lindell's Cyber Symposium. And given that Frankspeech sponsored, promoted, and livestreamed the Cyber Symposium—partly to advertise itself and partly to "educate the

13

A.5023

public," [Doc. 392-1 at 244:19–245:4]—a reasonable jury could also conclude that Mr. Lindell was acting as an agent for Frankspeech while organizing the event. Defendants' Motion for JMOL is respectfully **DENIED** on this ground.

### B.    Economic Damages

Defendants next argue that the Court must set aside the economic damages award as a matter of law. [Doc. 386 at 5–6]. In their view, Plaintiff's reputation was already "destroyed" by statements from other parties before Defendants made any defamatory statements of their own. [*Id.*]. The Court declined to grant summary judgment on this argument, [Doc. 261 at 11–12], and reaches the same conclusion now, *see Reeves*, 530 U.S. at 150 ("[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." (quotation omitted)). At summary judgment, the Court found that "Plaintiff has introduced evidence of continued harassment and targeting that a reasonable jury could connect with Defendants' alleged defamation based on the timing of the harassment and record evidence of large audiences for events like the Cyber Symposium." [Doc. 261 at 12].

Plaintiff did the same at trial. For instance, Dr. Coomer testified that "[t]he level of attention and threats that are directly correlated with the Cyber Symposium" caused him to "reengage[] with [his] therapist." [Doc. 393 at 153:5–20]. Although he previously "never felt the need to go on any type of medication," Dr. Coomer said the fallout from the Cyber Symposium put him in "in such a state that [he and his therapist] had discussions about going on medication, and I am on that [medication] to this day." [*Id.* at 153:15–20]. Dr. Coomer also testified that Mr. Lindell's statements "popularizing and republishing . . . and accusing me of election rigging" made it "clear that [Dr. Coomer] was unlikely to ever be

14

A.5024

able to work in anything related to elections again." *See* [*id.* at 155:14–156:3]. Similarly, Mr. Crane testified that while Mr. Lindell was not the "sole source" of Dr. Coomer's reputational problems, "he had the largest platform and amplified it as much as anybody else did." [Doc. 394 at 421:6–11]. And Plaintiff's expert, Doug Bania, testified that Mr. Lindell's media appearances and the Cyber Symposium attracted large audiences that enhanced the "reach" of the defamatory statements. *See, e.g.*, [Doc. 397 at 1356:8–24, 1360:10–1361:16, 1377:4–1379:21]. Mr. Bania estimated that the cost of a "reputational repair program" to restore Dr. Coomer's reputation would be approximately $2.7 million. *See* [*id.* at 1395:3–1398:22].

The Court appreciates that Defendants view the evidence differently, particularly Mr. Bania's testimony. [Doc. 386 at 6]. But viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff presented evidence from which a reasonable jury could conclude that Defendants' defamatory statements caused Plaintiff at least some economic damages. Defendants' Motion for JMOL is respectfully **DENIED** on this ground.

### C.    Actual Malice as to Defendant Lindell

Defendants' arguments as to Mr. Lindell's defamation liability stem from the fact that the jury declined to award punitive damages against Mr. Lindell.[3] [Doc. 386 at 7–8]. Defendants start from the premise that actual malice may be found where a party makes

---

[3] To the extent Defendants simply dispute the sufficiency of the evidence as to Mr. Lindell's actual malice, the Court agrees with Plaintiff that a reasonable jury could conclude that Mr. Lindell made the relevant statements with actual malice. *See* [Doc. 392 at ¶ 24 (summarizing some of the trial evidence that could support such a finding)]. Defendants point to Mr. Lindell's testimony that he did rely on sources when making comments about Dr. Coomer. [Doc. 386 at 8]. But the Court cannot weigh the competing evidence at this stage.

15

A.5025

a statement with reckless disregard for the statement's truth or falsity.  [*Id.* at 7 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1968) (further citations omitted)]. Defendants equate this standard to the meaning of "willful and wanton conduct" in the punitive damages context, which encompasses conduct that "was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff."  [*Id.* at 9 (quoting Doc. 371 at 64) (emphasis omitted)]; *accord* Colo. Rev. Stat. § 13-21-102(1)(b).  Because the jury "found that Lindell was not reckless," Defendants argue that he is "entitled to First Amendment protection as a matter of law."  [Doc. 386 at 9].

This argument fails for two reasons.  First, Defendants improperly conflate "actual malice" with the common law standard for willful and wanton conduct.  Actual malice, a term of art with a specific meaning in the defamation context, is distinct from common law standards of intent.  *See Masson v. N.Y. Mag., Inc.*, 501 U.S. 496, 510 (1991) (actual malice distinct from common law malice); *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995) (distinguishing "willfulness and wantonness" in the punitive damages context from the actual malice standard); *Talley v. Time, Inc.*, 923 F.3d 878, 895 (10th Cir. 2019) ("Actual malice is not a negligence or gross negligence standard.").  Whether Mr. Lindell acted with reckless disregard for the truth of his statements is a different question from whether he acted with disregard for the consequences, or of Dr. Coomer's rights. *Compare* [Doc. 371 at 43], *with* [*id.* at 64].  Thus, the jury's verdict that Mr. Lindell did not act willfully and wantonly in the punitive damages context does not, as a matter of law, preclude it from finding that he acted with actual malice.

16

A.5026

Second, even if the standards were the same, a jury could still find actual malice without awarding punitive damages, because punitive damages are subject to a higher burden of proof.  A plaintiff must establish actual malice by clear and convincing evidence. *L.S.S. v. S.A.P.*, 23 P.3d 1280, 1289 (Colo. App. 2022) (citations omitted).  Punitive damages, by contrast, must be proven beyond a reasonable doubt.  *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1092 (Colo. 2011).  Even under Defendants' view of these standards, a jury could conclude that a plaintiff met its burden as to actual malice but failed to clear the higher bar of reasonable doubt.  The Motion for JMOL is respectfully **DENIED** on this ground.

### D.    Actual Malice as to Frankspeech

Finally, Defendants contend that they are entitled to judgment as a matter of law as to the defamation claim against Frankspeech.  [Doc. 386 at 10–11].  The Court's conclusions thus far mostly dispose of Defendants' arguments on this point.  Defendants argue, for instance, that the evidence "showed that Frankspeech's presence was merely to livestream an event that Frankspeech *did not create nor control*."  [*Id.* at 10].  But, as explained, Plaintiff presented evidence showing Frankspeech's involvement with the Cyber Symposium went further than merely livestreaming the event, and the Court has already held that a reasonable jury could conclude that Mr. Lindell and Mr. Clements were agents of Frankspeech for purposes of the Cyber Symposium.  The jury could thus reasonably hold Frankspeech liable for defamation so long as it found that Mr. Clements's statement was defamatory.  *See Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 585 (Colo. App. 2024) ("[I]f an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement." (quoting

17

A.5027

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982))) (further citation omitted).  And viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Mr. Clements made his August 12, 2021, statement at the Cyber Symposium with actual malice.

As the jury was instructed, actual malice may be shown through circumstantial evidence, including "(1) the speaker's hostility toward the plaintiff; (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the information." *Donald J. Trump*, 552 P.3d at 592; [Doc. 371 at 43].  The jury could reasonably have inferred that Mr. Clements acted with actual malice based on several of these factors.  The jury could have perceived Mr. Clements as hostile toward Dr. Coomer based on the statement itself.  *See* [Doc. 371 at 15 ¶ 36 (referring to Dr. Coomer as "the man that pulled the trigger" to "murder the American people's vote")].  The jury could have doubted the veracity or reliability of Mr. Oltmann, the source for Mr. Clements's statement, who testified at trial.  The jury could have found the claim inherently improbable or otherwise contradicted by the testimony of Dr. Coomer himself or the testimony of Dr. J. Alex Halderman, Plaintiff's election security expert.  Defendants, of course, disputed all of these sources of evidence at trial and continue to do so.  But the Court cannot conclude that "the evidence points but one way" as to Mr. Clements's actual malice.  *Elm Ridge*, 721 F.3d at 1216.

For the same reasons, the Court is unpersuaded by Defendants' last argument that the punitive damages award against Frankspeech must be vacated based on Plaintiff's failure to prove actual malice.  [Doc. 386 at 10–11].  Having rejected all of

18

A.5028

Defendants' asserted bases for judgment as a matter of law, the Court respectfully **DENIES** Defendants' Motion for JMOL.

## II.      Plaintiff's Motion to Amend Final Judgment

Plaintiff asks the Court to increase the punitive damages award against Frankspeech based on conduct that occurred during the pendency of the case. [Doc. 387]. Colorado's exemplary damages statute permits a court to increase an award of punitive or exemplary damages to no more than three times the amount of actual damages. Colo. Rev. Stat. § 13-21-102(3). An increase is appropriate if it is shown that:

> (a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case; or
>
> (b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

*Id.* The statute defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13-21-102(1)(b). The plaintiff bears the burden of proving beyond a reasonable doubt that the increased exemplary damages are appropriate. *See Coors v. Sec. Life of Denv. Ins. Co.*, 112 P.3d 59, 67 (Colo. 2005); Colo. Rev. Stat. § 13-25-127(2) (permitting exemplary damages only when "the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13-21-102"). Whether to increase a punitive damages award under § 13-21-102(3)(b) is within the trial court's discretion. *Gen. Steel Domestic Sales, LLC v.*

19

A.5029

*Bacheller*, 291 P.3d 1, 11 (Colo. 2012).  In exercising its discretion, the Court is mindful that "[t]he general purposes of punitive damages under section 13-21-102 are punishment of the defendant and deterrence against the commission of similar offenses by the defendant or others in the future."  *Coors*, 112 P.3d at 65.

Plaintiff seeks increased punitive damages under both subsections (a) and (b). [Doc. 387].  The Court addresses each in turn.

### A.    Subsection (a):  Continued Defamation

Plaintiff first argues that increased exemplary damages are appropriate based on Frankspeech's "continued . . . defamation campaign" against Dr. Coomer during the lawsuit.  [*Id.* at 8].  This conduct includes Mr. Lindell's appearance on a radio show to discuss Dr. Coomer's alleged "election crimes of 2020" and Mr. Lindell's receipt of a spreadsheet containing the personal information of individuals in Dr. Coomer's "social circles" and individuals who worked for other voting system companies.  [*Id.* at ¶¶ 15–16]. Plaintiff also points to three other statements repeating claims about Dr. Coomer:  (1) Mr. Lindell's statement on a podcast on May 23, 2022; (2) a statement by Tina Peters on September 7, 2022 that aired on Frankspeech; and (3) a statement by Mr. Lindell on March 10, 2023 that aired on Frankspeech.  [*Id.* at ¶¶ 17–19].  Plaintiff characterizes these as "additional, defamatory statements against [him] since the filing of this action on April 4, 2022."  [*Id.* at ¶ 20].  Frankspeech counters that this argument amounts to an effort to "sidestep the jury's verdict" and obtain a "second bite at the apple" on claims that the jury rejected at trial.  [Doc. 404 at 4–5].

The Court agrees with Frankspeech that increased exemplary damages are not warranted under subsection (a).  With respect to the radio show appearance, Plaintiff has

A.5030

failed to demonstrate that Frankspeech can be held liable for this instance of Mr. Lindell's

conduct.  To be sure, Mr. Lindell is the founder of Frankspeech and often acted as its

representative.  [Doc. 371 at 10 ¶ 7; Doc. 387 at ¶ 13]].  But, as explained above, a

corporation is only liable for its agents' acts "within the scope of their authority."  *Dallas

Creek*, 933 P.2d at 41.  Beyond a passing reference to Mr. Lindell's connection to

Frankspeech, Plaintiff does not explain why Mr. Lindell's radio appearance was within the

scope of his authority as Frankspeech's founder and frequent representative.  Unlike

many of Mr. Lindell's other statements, there is no evidence that this statement was aired

on Frankspeech, that Frankspeech sponsored or promoted the interview, or that Mr.

Lindell mentioned Frankspeech at all during the interview.  Nor can Plaintiff rely on the

lower Rule 50 standard here—whether a reasonable jury could conclude that Mr. Lindell

made this statement as an agent of Frankspeech is not the correct inquiry, because

Plaintiff's burden in the punitive damages context is significantly higher.  Plaintiff has

failed to demonstrate beyond a reasonable doubt that this statement was within the scope

of Mr. Lindell's authority as an agent of Frankspeech.

As for Mr. Lindell's receipt of a spreadsheet, Plaintiff does not explain how this is

the same "behavior or . . . action which is the subject of the claim."  § 13-21-102(3)(a).

Plaintiff sued for defamation based on Defendants' public statements and brought

additional IIED and conspiracy claims that arose from and depended on his defamation

claims.  *See* [Doc. 371 at 28–33, 47–49, 53–54].  Mr. Lindell's alleged private receipt of

a spreadsheet containing personal information—invasive as it might be—is not the same

behavior or action as a public defamatory statement.  Nor does Plaintiff allege, let alone

provide competent evidence to show, that this spreadsheet contributed to any defamatory

A.5031

statements about him or otherwise aggravated his damages.  Plaintiff fails to prove that

additional punitive damages are warranted based on the spreadsheet.

That leaves the remaining statements that repeated election-rigging claims about

Dr. Coomer.  Plaintiff refers to these statements as "additional, defamatory statements."

[Doc. 387 at ¶ 20].  But all three statements were presented to the jury in connection with

Plaintiff's defamation claim, and the jury did not find Frankspeech (or any Defendant)

liable for defamation on any of them.  [Doc. 377 at ¶¶ 1i–1k].  The Court respectfully

declines to impose punitive damages for statements that the jury found did not amount to

defamation.  Although the jury's verdict does not necessarily bind this Court's analysis

under § 13-21-102(3),[4] awarding punitive damages against Frankspeech for this conduct

would not advance the purposes of punitive damages.  For one, Frankspeech's

nondefamatory political speech is entitled to constitutional protection.  *See, e.g.*, *Milkovich*

*v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters

of public concern which does not contain a provably false factual connotation will receive

---

[4] To be clear, the Court does not adopt Frankspeech's position that awarding punitive damages for these statements under § 13-21-102(3) would violate the Seventh Amendment's Reexamination Clause. *See* [Doc. 404 at 1–4]. The Reexamination Clause forbids courts from "re-examin[ing]" any "fact tried by a jury." U.S. Const. amend. VII. The Court perceives some daylight between whether Defendants engaged in fraudulent, malicious, or willful and wanton defamation—a jury question, *see* [Doc. 371 at 63; Doc. 377 at 3]—and the present inquiry of whether Defendants continued their conduct that was the subject of a defamation claim in a willful and wanton manner. The latter inquiry does not require the conduct to actually be defamatory.  But the Court need not conclusively resolve this question.  To the extent Defendants challenge § 13-21-102(3) more broadly, the Court notes that the statute only permits a court to "increase" a jury's punitive damages award, not award punitive damages in the first instance. The Supreme Court has held that "the level of punitive damages is not really a 'fact' 'tried' by the jury," so judicial review of the amount of an award does not implicate the Reexamination Clause. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (quotation omitted).

22

A.5032

full constitutional protection."). It would make little sense to punish Frankspeech for statements that were later found to be lawful and nondefamatory and therefore protected. Nor is it clear what deterrence purpose such an award would serve. The jury has already awarded punitive damages against Frankspeech for its unlawful conduct. [Doc. 377]. Imposing punitive damages for lawful speech—merely because other, similar statements were later found to be unlawful—would deter *any* speech related to the subject of a defamation lawsuit, not just defamatory speech. The jury awarded $300,000 of punitive damages against Frankspeech for its unlawful conduct, [*id.* at 3], and the Court finds that this award is sufficient to punish Frankspeech and deter future offenses.

Finally, the Court notes that the Colorado Court of Appeals has affirmed trial courts' decisions not to increase a punitive damages award even where a jury *did* find the defendant's conduct was willful and wanton. *Harvey v. Farmers Ins. Exch.*, 983 P.2d 34, 40 (Colo. App. 1998) (finding no abuse of discretion, despite jury finding that conduct was willful and wanton, where it was not "uncontroverted" that the defendant had engaged in a continuing conduct with reckless disregard for the plaintiff's rights); *Vickery v. Vickery*, 271 P.3d 516, 520 (Colo. App. 2010) (finding no abuse of discretion in trial court's decision not to increase punitive damages, even though plaintiff had amended complaint to add defamation claims for statements during the pendency of the action, and jury had awarded compensatory and exemplary damages on those claims), *rev'd sub nom. on other grounds*, *Vickery v. Evans*, 266 P.3d 390 (Colo. 2011). The absence of any such jury finding here only bolsters the Court's conclusion that increased punitive damages are unwarranted. Thus, even assuming Plaintiff could prove that Frankspeech made the relevant statements willfully and wantonly, the Court exercises its discretion to decline to

A.5033

increase the punitive damages award under subsection (a).  *See Netquote, Inc. v. Byrd*, No. 07-cv-00630-DME-MEH, 2009 WL 902437, at *15–17 (D. Colo. Apr. 1, 2009) (finding that defendant's continued conduct was willful and wanton under subsection (a) but declining to exercise discretion to increase punitive damages award where existing award was "sufficient").

### B.    Subsection (b):  Litigation Conduct

Plaintiff next seeks additional punitive damages based on Mr. Lindell's litigation conduct that "magnified, prolonged and exacerbated Dr. Coomer's damages."  [Doc. 387 at ¶ 21].  That conduct includes:  (1) Mr. Lindell's "combative" and "disrespectful" conduct during his deposition, [*id.* at ¶ 22]; (2) Mr. Lindell's public statements criticizing Dr. Coomer, his attorneys, his witnesses, and the lawsuit in general, [*id.* at ¶¶ 24–25, 29–36]; and (3) other litigation conduct, including two allegedly obstructive motions and Mr. Lindell's apparent violation of the Court's order regarding the use of technology in the courtroom, [*id.* at ¶ 37]; *see also* [Doc. 344 at 3].  Plaintiff contends that "Frankspeech knew or should have known that its continued defamation of Dr. Coomer and public statements about the lawsuit would cause an aggravation of Dr. Coomer damages."  [Doc. 387 at ¶ 39].  Frankspeech disputes Plaintiff's characterization of its litigation conduct. *See* [Doc. 404 at 6–7, 11–12].  More specifically, Frankspeech responds that these statements cannot be imputed to Frankspeech, that Plaintiff has not proved that Defendants' litigation conduct aggravated his damages, and that Frankspeech's conduct was not willful and wanton.  *See* [*id.* at 5–14].

The Court respectfully agrees with Frankspeech that, at a minimum, Plaintiff has failed to prove that the litigation conduct aggravated his damages.  Plaintiff contends that

24

A.5034

Mr. Lindell's statements "dr[ew] further attention to the defamatory statements about him."
[Doc. 387 at ¶ 21]. That argument implicitly concedes that Mr. Lindell's statements did not repeat the election-fraud accusations against Dr. Coomer that formed the basis of his defamation claim. Rather, the statements now invoked by Plaintiff primarily complain about Dr. Coomer engaging in "lawfare" in general, as opposed to accusing him of election-rigging, treason, or other crimes. *Compare, e.g.*, [Doc. 371 at 12 ¶ 28, 15 ¶ 40], *with* [Doc. 387 at ¶¶ 24–25, 29, 32–33, 35]. Mr. Lindell's more pointed personal attacks were instead directed at Dr. Coomer's attorneys and his expert witness, Dr. Halderman. [Doc. 387 at ¶¶ 25, 31, 33]. Plaintiff's argument that these statements aggravated his damages by drawing attention to previous defamatory statements is wholly conclusory. Plaintiff has provided no explanation or evidence that these statements led to additional harassment, further reduced his employment prospects, or even caused him renewed emotional distress. The Court declines to comb the record or construct arguments on Plaintiff's behalf, especially given the high burden of proof he faces at this stage. *See Adams*, 223 F. App'x at 762 n.4 ("It is not the job of this court to search the record . . . for evidence."). Plaintiff has failed to prove beyond a reasonable doubt that this conduct aggravated his damages.

Nor does Frankspeech's other litigation conduct demonstrate aggravation of damages, either alone or in combination with Mr. Lindell's statements. Plaintiff has provided no evidence that his damages were aggravated by Mr. Lindell's deposition conduct, the motions to stay discovery and continue trial, or Mr. Lindell's alleged improper use of technology in the courtroom. He does briefly suggest that this conduct "prolonged" his damages. [Doc. 387 at ¶ 21]. But this argument is insufficiently developed, and, in

A.5035

any case, the Court finds that prejudgment interest will adequately compensate Dr. Coomer for the delay between accrual of his claims and the entry of judgment. *See* [Doc. 381 (awarding pre-judgment interest pursuant to Colo. Rev. Stat. § 13-21-101)].

Because the Court finds that increased punitive damages are not warranted under either subsection of § 13-21-102(3), the Court need not reach Frankspeech's constitutional arguments. *See supra* note 4. Plaintiff's Motion to Amend Final Judgment is respectfully **DENIED**.

### III.    Order to Show Cause

Before concluding, the Court must address Frankspeech's brief in response to Plaintiff's Motion to Amend Final Judgment. Troublingly, given the background of this case, Frankspeech's response brief misattributes a district court case to the Tenth Circuit. On the first page of its brief, Frankspeech states that "[t]he 10th Circuit recognized in *Capital Solutions, LLC v. Konica Minolta Business Solutions USA, Inc.*, 695 F.Supp.2d 1149, 1154-56 (10th Cir. 2010), that the jury's determination on this issue is entitled to finality."[5] [Doc. 404 at 1]. As the Federal Supplement reporter citation indicates, however, *Capital Solutions* is not a Tenth Circuit decision. *See Cap. Sols., LLC v. Konica Minolta*

---

[5] Although the Court is primarily concerned with counsel's erroneous citation, this description of *Capital Solutions*'s holding is also misleading. *Capital Solutions* dealt with a Kansas statute that "prescribes a procedure by which the jury first determines whether punitive damages should be allowed, and then the court determines the amount of such damages in a separate proceeding." *Cap. Sols., LLC v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 695 F. Supp. 2d 1149, 1152 (D. Kan. 2010) (citing Kan. Stat. Ann. § 60-3702(a) (2010)). Before trial, the court held that the Seventh Amendment's "trial by jury" clause—not the Reexamination Clause—entitled a plaintiff "to have the entirety of its claim for punitive damages, including the determination of the amount, decided by the jury." *Id.* at 155–56. In other words, *Capital Solutions* dealt with whether a jury should decide the amount of punitive damages in the first instance, as opposed to ruling that an award of punitive damages is "entitled to finality" in the post-trial context. *Compare id.*, *with* [Doc. 404 at 1].

A.5036

*Bus. Sols. U.S.A., Inc.*, 695 F. Supp. 2d 1149 (D. Kan. 2010).  Nor was that decision appealed to the Tenth Circuit.  A reasonable review by counsel should have alerted them of the error; it is well-understood to any lawyer that the Federal Supplement is the reporter for district, not circuit, court decisions.  *See* The Bluebook:  A Uniform System of Citation 257–60 tbl. T1.1 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025) (explaining that modern federal appellate court decisions are reported in the Federal Reporter or Federal Appendix and modern district court decisions are reported in the Federal Supplement or the Federal Rules of Decision).

The Court has previously sanctioned defense counsel under Rule 11 for, among other things, this exact type of error.  *See* [Doc. 383 at 2, 16]; Fed. R. Civ. P. 11.  At that time, defense counsel both admitted that their previous citation errors were produced by artificial intelligence but then claimed that the errors resulted from a one-off mistaken filing of the wrong draft, not a failure to properly review their citations for accuracy.  *See* [Doc. 311; Doc. 315].  The Court cannot ignore this reoccurring conduct simply because the trial is over.  Regardless of whether generative artificial intelligence was used or not, the Tenth Circuit has been clear that an attorney has a "**fundamental duty**" to the Court to confirm that all legal authorities in submissions to the Court are accurately cited, reflect accurate quotations, and stand for the propositions for which they are cited.  *See Amarsingh v. Frontier Airlines, Inc.*, No. 24-1391, 2026 WL 352016, at *7 (10th Cir. Feb. 9, 2026) (emphasis added).  And the Circuit has similarly been clear that failing to do so warrants sanctions, even for pro se litigants who may typically receive more lenience than an attorney.  *Id.*  Here, it is inexplicable how these errors—the misrepresentation to the Court that this principle came from binding Tenth Circuit authority and the mis-citation of the

27

A.5037

case—occurred **yet again** after the Court's prior Order to Show Cause laying out the applicable principles under Rule 11 of the Federal Rules of Civil Procedure.  In that prior order, the Court concluded that sanctioning each defense attorney $3,000 was "the least severe sanction adequate to deter and punish defense counsel in this instance."  [Doc. 383 at 19].  It appears that the Court's prior admonitions and sanctions have had little, if any, remedial impact.

Accordingly, no later than **April 8, 2026**, Defendants are **ORDERED to SHOW CAUSE** why Frankspeech, Christopher I. Kachouroff, and Jennifer DeMaster[6] should not be sanctioned, jointly and severally, a graduated amount of $5,000 for their continued failure to check their citations as required by Rule 11 before submission to the Court, and why Mr. Kachouroff should not be referred to the State Bar of Virginia and Ms. DeMaster to the State Bar of Wisconsin for disciplinary proceedings for violations of applicable Rules of Professional Conduct as set forth in the Court's original Order to Show Cause. [Doc. 309; Doc. 383].

---

[6] That this Court permitted Ms. DeMaster to withdraw from the case in December 2025 is of no moment.  [Doc. 410].  Ms. DeMaster signed the response brief, [Doc. 404 at 15], and Rule 11 permits a court to sanction "any attorney, law firm, or party that violated the rule or is responsible for the violation," Fed. R. Civ. P. 11(c)(1).  "[S]ince the conduct subject to sanctions typically is appraised as of the time of the filing, courts properly have held that an attorney cannot immunize himself from the imposition of sanctions under Rule 11 simply by withdrawing from the case." *United States v. RAPower-3, LLC*, No. 2:15-cv-00828-DN-DAO, 2020 WL 9148117, at *2 (D. Utah July 8, 2020) (quoting Wright & Miller's Federal Practice & Procedure § 1337.1 (4th ed., April 2020 update)); *cf. Automobile Assurance Fin. Corp. v. Syrett Corp.*, No. 96-4036, 1997 WL 49440 (10th Cir. Feb. 7, 1997) (affirming Rule 11 sanctions order where district court granted sanctioned attorney leave to withdraw before issuing sanctions).

A.5038

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants Michael J. Lindell's and Frankspeech LLC's Rule 50(b) Renewed Motion for Judgment as a Matter of Law [Doc. 386] is **DENIED**;

(2)    Plaintiff's Motion to Amend Final Judgment [Doc. 387] is **DENIED**;

(3)    No later than **April 8, 2026**, Defendants are **ORDERED to SHOW CAUSE** why Frankspeech, Christopher I. Kachouroff, and Jennifer DeMaster should not be sanctioned, jointly and severally, a graduated amount of $5,000 for their continued failure to check their citations as required by Rule 11 before submission to the Court, and why Mr. Kachouroff should not be referred to the State Bar of Virginia and Ms. DeMaster to the State Bar of Wisconsin for disciplinary proceedings for violations of applicable Rules of Professional Conduct as set forth in the Court's original Order to Show Cause; and

(4)    Because the Court has resolved both Motions on the current record, Plaintiff's Request for Status Conference [Doc. 412] is **DENIED as moot**.

DATED:  March 25, 2026

BY THE COURT:

_____
Nina Y. Wang
United States District Judge

29

A.5039